TINKER & SCOTT v. UNITED STATES FIDELITY & GUARANTY CO.

(Circuit Court, D. Oregon. March 29, 1909.)

No. 3,148.

1. UNITED STATES (§ 70*)—PUBLIC IMPROVEMENT CONTRACT—TERMINATION—STIPULATIONS.

A provision in United States improvement contract that the United States might treat any assignment or transfer of the contract or subletting of the work as an annulment thereof, or might recognize the acts of the contractors as valid, as it should feel disposed, was for the sole benefit of the government, the observance of which could not be insisted on by other parties in interest.

[Ed. Note.—For other cases, see United States, Dec. Dig. § 70.*]

2. UNITED STATES (§ 70*)—IMPROVEMENT CONTRACT—SPECIFICATIONS—TERMINATION—USE OF APPLIANCES—"EMPLOYED ON ANY OF THE WORKS"—"MATERIALS BELONGING TO CONTRACTOR DELIVERED ON GROUND."

One of the specifications of United States improvement contract provided that if the contractor should fail to prosecute the work, or begin the delivery of material in such manner as to insure a full compliance within the time limit, or if any question should arise as to whether the contractor was properly carrying out the contract in its true intent and meaning, and on his neglect or refusal after notice to provide means for a more energetic compliance with the contract, the Secretary of the Interior might suspend the work and take possession of all machinery, tools, appliances, and animals "employed on any of the works," and all "materials belonging to the contractor delivered on the ground," and use the same to complete the work, etc. *Held*, that on the termination of the contract, under such specification, the Secretary of the Interior's right to take possession of machinery, tools, appliances, and animals was not limited to those employed by the contractor, but included all that were "employed on any of the works," by any one, whether contractor or subcontractor, but that the government's right to materials was limited to those on the ground and owned by the contractor.

[Ed. Note.—For other cases, see United States, Dec. Dig. § 70.*]

3. TROVER AND CONVERSION (§ 23*)—PERSONAL PROPERTY—RIGHTS OF POSSESSION.

Where the United States had taken possession of a crusher and a power plant under lawful authority, on termination of the contract for a public improvement, because of the contractor's default, and the government turned over such plants to defendant for use in the completion of the work as the contractor's surety, defendant's possession of the plants was lawful, and it was not therefore chargeable for conversion thereof.

[Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. §§ 163–166; Dec. Dig. § 23.*]

4. UNITED STATES (§ 70*)—CONTRACT—TERMINATION—RIGHT TO MATERIAL—"DELIVERY."

Where a public improvement contract provided for termination at the election of the United States on the contractor's default, in which event the Secretary of the Interior might take possession of all materials belonging to the contractor delivered on the ground, and might use the same to complete the work, rock excavated by certain subcontractors and placed in position convenient to a crusher plant to be crushed, though material placed or "delivered" within the contract, was nevertheless not the property of the contractor, and hence was not subject to appropriation by the government on terminating the contract.

[Ed. Note.—For other cases, see United States, Dec. Dig. § 70.*

For other definitions, see Words and Phrases, vol. 2, pp. 1958–1970; vol. 8, p. 7632.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

Hogue & Wilbur and F. S. Senn, for plaintiffs.
M. L. Pipes and Beach & Simon, for defendant.

WOLVERTON, District Judge. This is an action in trover, and was submitted for trial by the court without the intervention of a jury.

On the 23d day of September, 1905, the United States let to Prendergast & Clarkson, a corporation, a contract for the construction and completion of the Shoshone dam and auxiliary works, Shoshone Project, Wyo., in accordance with the proposal and specifications attached to the contract and made part thereof. By the fourth article of the contract, it is stipulated that, in conformity with the requirements of section 3737 of the Revised Statutes (U. S. Comp. St. 1901, p. 2507):

"Neither this contract nor any interest therein shall be transferred to any other party or parties, and that any such transfer shall cause the annulment of the contract so far as the United States is concerned."

By section 22 of the specifications, under the head of "General Conditions," it is further provided as follows:

"Suspension of Contract. Should the contractor fail to begin the work within the time required, or fail to begin the delivery of material as provided in the contract, or fail to prosecute the work or delivery in such manner as to insure a full compliance with the contract within the time limit, or should any question arise as to whether or not the contractor is properly carrying out the provisions of his contract in their true intent and meaning, at any time during the progress of the work, notice thereof in writing shall be served upon him, and upon his neglect or refusal to provide means for a more energetic and satisfactory compliance with the contract within the time specified in such notice, then and in either case the Secretary of the Interior shall have the power to suspend the operation of the contract, and he may take possession of all machinery, tools, appliances, and animals employed on any of the works to be constructed under the contract and of all materials belonging to the contractor delivered on the ground, and may use the same to complete the work, or he may employ other parties to carry the contract to completion, substitute other machinery or materials, purchase the material contracted for in such manner as he may deem proper, or hire such force and buy such machinery, tools, appliances, materials, and animals at the contractor's expense as may be necessary for the proper conduct of the work and for finishing it in the time agreed upon. Any excess of cost arising therefrom over and above the contract price will be charged against the contractor and his sureties, who shall be liable therefor. The failure to order improvement of methods or increase of force, plant, or efficiencies will not relieve the contractor from his obligation to perform good work or finish in the time agreed upon."

The defendant, the United States Fidelity & Guaranty Company, executed its bond to the United States in the sum of $100,000 for the faithful performance of the contract on the part of Prendergast & Clarkson, and for the payment of the demands of all persons supplying labor and materials for the prosecution of the work provided for therein.

On February 26, 1906, Prendergast & Clarkson entered into a contract with Tinker & Scott, the plaintiffs, whereby Tinker & Scott agreed to furnish Prendergast & Clarkson the entire quantity of crushed stone and sand to be used for concrete in the construction of the "base of dam," "portion of the dam above the base," and "crest of

weir"; also, to excavate the "spillway" both "open cut and tunnel excavation"; also the "road tunnel"—and to utilize the excavated material, or such portion thereof as should be acceptable to the engineer. for concrete material, the crushed stone and sand to be delivered in separate bins, to be ·furnished and maintained by them.   Tinker & Scott further agreed to furnish and maintain adequate plant, consisting of power plant, crushing, screen and conveying plant, drilling plant, and all other necessary equipment and appliances that from time to time might become necessary to keep the organized forces of Prendergast & Clarkson furnished with concrete material; but that, in case of failure from any cause whatever on their part to carry out the agreement, all of said plant, equipment, and appliances were to remain on the works for the use of Prendergast & Clarkson, free of cost, until their contract should be finished.   It was further agreed that Tinker & Scott should have all their accounts affecting the agreement carried by and in the name of Prendergast & Clarkson, and that they should furnish from time to time such money as was necessary from the books and accounts to meet and defray their expenditures; and, further, that they should be bound by the plans, specifications, and instructions furnished by the United States government to Prendergast & Clarkson in their entirety, and with no exception whatever, such plans and specifications being attached thereto.   In consideration of which agreement on the part of Tinker & Scott, Prendergast & Clarkson agreed to pay them $1.60 per cubic yard for all crushed rock furnished. in bins, except such as should be taken from tunnel and road excavation, approximating 7,600 cubic yards, for which Prendergast & Clarkson were to pay $4 per cubic yard.   By an addendum it was further agreed that one central power plant should be constructed jointly by the contracting parties, and that when the work was completed the plant should be owned by them jointly.   By another addendum it was further agreed that the rock excavated from the cliffs known as the "keys" should be on the parties' joint account, and that they, as to this, should divide the profits and losses equally.

Tinker & Scott entered upon the discharge of their agreement, and so continued from the date thereof until some time in August following.   During the time there was accumulated for their use a considerable amount of goods, wares, and chattels, consisting of tools, implements, and materials for use in carrying out the work agreed to be performed by them.   There was also provided for their use a crusher and a power plant, including all appliances and instrumentalities entering into the construction of either.   The crusher was for crushing rock for use in the concrete work, and was located near the spillway, and the power plant was designed to furnish power for use in running the crusher, and in running certain machinery under the control and management of Prendergast & Clarkson.   During the time there was also excavated from the spillway 3,000 yards of rock, and from what is known as the "keys" 5,000 yards.   The rock from the spillway was conveyed to a locality near the crusher, or within about 100 feet therefrom, with a view to crushing the same later, and placing it in bins for use.   All this property, including the rock, subsequently came into the

possession of the defendant; and plaintiffs, claiming that the same was tortiously taken from them, sue the defendant for a conversion thereof.

Preliminarily, it should be stated that the stipulation contained in article 4 of the government's contract with Prendergast & Clarkson was inserted for the benefit and protection of the government alone. It may treat any assignment or transfer of the contract or subletting of the contract work as annulling the same, or it may recognize the acts of the contractors in that respect as valid, as it may feel disposed. All other parties interested, or who may become interested in the contract, save the government, may not insist upon the observance of the stipulation. Goodman v. Niblack, 102 U. S. 560, 26 L. Ed. 229; Hobbs v. McLean, 117 U. S. 567, 6 Sup. Ct. 870, 29 L. Ed. 940; Dulaney v. Scudder, 94 Fed. 6, 36 C. C. A. 52.

From the weight of the testimony, it appears that the small tools and implements used by Tinker & Scott in their work of putting the crusher and power plant in place, and for excavation, and the materials designed for use by them, were purchased of Prendergast & Clarkson, and became and were at the time of the alleged conversion the property of Tinker & Scott. That firm was also in possession of the same. The crusher and appurtenances were purchased by Prendergast & Clarkson for use by Tinker & Scott, with the view and purpose that the latter should eventually own the same; but they had, at the time of the alleged conversion, paid no part of the purchase price. Such was also the case as it respects certain boilers, and a compressor designed for use in connection with the power plant. Tinker & Scott were in possession of the crusher and such other instrumentalities as were not connected with the power plant. The power plant and its appurtenances were designed for the joint use of plaintiffs and Prendergast & Clarkson. They were purchased by Prendergast & Clarkson; no part of the purchase price thereof having been paid by the plaintiffs. This plant and its appliances were jointly used by the contracting parties, and they were probably in the joint possession thereof at the time of the alleged conversion. The rock excavated from the spillway was in the possession of Tinker & Scott, and that from the keys, dropped into the bed of the stream, was in the joint possession of Prendergast & Clarkson and Tinker & Scott, so far as it could be said to be in the possession of any one other than the owners of the land upon which the improvements were to be constructed. I speak of the time of the alleged conversion. To be more exact, the time should be fixed as that when the government interfered to take possession of the works installed for carrying on the project under the government's contract with Prendergast & Clarkson.

I do not attempt to resolve exactly the ownership and the possession of this property at the time, as, under the view I take of the controversy, I do not deem it essential that I should do so. As I construe paragraph 22 of the specifications of Prendergast & Clarkson's agreement to construct the dam and auxiliary works, Shoshone Project, the Secretary of the Interior was authorized, upon a failure by Prendergast & Clarkson to carry forward the work with reasonable dispatch, to take possession of all machinery, tools, appliances, and animals em-

ployed on any part of the works to be constructed under the contract. The contract does not read "employed by the contractor," but all machinery, etc., "employed on any of the works," comprehending, by fair and unmistakable intendment, employment by any one, whether by the contractor or any subcontractor, so that they were employed upon the works. This rendition becomes more apparent by a further reading of the clause as follows: "And of all materials belonging to the contractor delivered on the ground"—thus limiting the materials that might be taken to such as were owned by the contractor and then upon the ground. But as to the machinery, tools, and appliances, there is no restriction except that they should be employed upon the work. The Secretary of the Interior is further authorized to use the same—that is, such machinery, appliances, tools, and materials as he is empowered to take possession of—to complete the work, or he may employ other parties to carry the contract to completion. Tinker & Scott are, by their specific agreement with Prendergast & Clarkson, as much bound by this condition as the latter, for it is made a part of their contract; but, if it were otherwise, having taken a subcontract to do a portion of the work, Tinker & Scott would be bound by a condition so general in its application.

There can be but little contention relative to the government taking possession of all the property described in the complaint. The fact is established by the testimony of H. M. Savage, John McGregor, T. J. Prendergast, and James F. Clarkson. It is unnecessary to extend comment upon the testimony showing its bearing and relation and what it tends to prove. It is sufficient that the conclusion of fact is as stated. The government took possession on August 14, 1906, and turned the entire property over to the defendant about the middle of September, so that the latter might complete the project as surety for Prendergast & Clarkson.

I may now determine the legal conclusions attending the controversy. The defendant's counsel say in their brief:

"There is a list of the small tool bill, the price of which were charged to Tinker & Scott and delivered to them, as to which the defendant is willing to yield."

This settles the dispute as to the list of tools and materials, for there are materials contained in the list which cannot be denominated tools. The value thereof has been shown to be $2,064.35, and the plaintiffs are entitled to recover for that item. As it relates to the crusher plant, which was in the possession of Tinker & Scott at the time, the government had the right and authority to take it into its possession, under the terms of the contract with Prendergast & Clarkson, upon their failure to proceed with the construction work, as stipulated in paragraph 22. The government having taken possession of this plant under lawful authority, and having turned the same over to the defendant for use in the completion of the work in pursuance of the purpose of Prendergast & Clarkson's contract, the defendant is therefore in lawful possession, and is not chargeable with a conversion of the plant. The power plant was taken by the government, and turned over to the defendant in the same way, so there is also no liability

on the part of defendant in trover by the real owners, whoever they may be.

A different question arises as respects the rock taken from the spillway. The excavation was made and the rock produced by the work and labor furnished by the plaintiffs, and at their own expense. The plaintiffs may have overdrawn their account with Prendergast & Clarkson in payment for the labor, but that only bears upon the relation between these two contracting parties of debtor and creditor. Prendergast & Clarkson had no right to the rock excavated, nor was any lien reserved thereon for their benefit. The rock constituted material on the ground, which was designed to be manufactured into crushed rock and placed in bins for use by Prendergast & Clarkson for their concrete work. It was material, but not delivered on the ground by the contractor, nor can it be said to have belonged to the contractor. The labor of Tinker & Scott, as is apparent, produced it, and they were intending to manufacture it into crushed rock, and they had placed it in position convenient to the crusher for so manufacturing it, so that it was material placed or "delivered," using the language of the government's contract, on the ground by Tinker & Scott, not the government's contractor, and it was still in their possession for further reduction into crushed rock. That the rock in its unfinished state was taken from the spillway does not differentiate it from rock that might have been brought from beyond the confines of the government's project and delivered thereon as material for use in construction. In either case it must be treated as material delivered on the ground, not by the contractor, but by the subcontractor. This being the case, the government was without authority, under its contract with Prendergast & Clarkson, to take the rock into possession or to deliver the same over to the defendant. Therefore the defendant's possession thereof is wrongful as against the plaintiffs, and the latter are entitled to recover its value.

The only testimony given upon the value of this rock is that of Tinker. He says there is a swell in the bulk of crushed rock above its mass in the ledge of about 75 per cent., so that a cubic yard from the ledge will make 1¾ yards of the crushed material. He further states that it is worth 40 cents per cubic yard to crush the rock. Three thousand yards in the ledge would make 5,250 cubic yards of crushed material. At $1.60 per cubic yard the product would be $8,400. By deducting 40 cents per cubic yard for crushing, the balance would constitute the aggregate value, namely, $6,300. The value claimed, however, is but $6,000—$2 per ton as measured in the ledge—which amount plaintiffs are entitled to recover.

Another item claimed is for 5,000 yards of rock. This rock was excavated from the keys and thrown into the bed of the river. By reason of its position, it was worthless for use for manufacturing crushed rock unless at a much larger expense than Tinker & Scott were to get for the material in the bin. It was of no value therefore as material on the ground.

As to the further item of 200 yards of rock taken from the tunnel, there is no proof concerning it. I conclude therefore that plain-

tiffs are entitled to recover for the small tools, etc., $2,064.35, and for the rock taken from the spillway and placed in proximity to the crusher for crushing purposes, $6,000, amounting in the aggregate to $8,064.35.