14195. DAVIS, director-general, *v.* GOSSETT & SONS.

The provision in the contract with the railway company, under which the spur-track to the plaintiff's plant was constructed, to the effect that the railroad company should not be liable for destruction of property upon the premises by fire, etc., was not void as being contrary to public policy.

The Federal director-general took the place of the railway company in the contract mentioned above.

Change or extension of the spur-track, which was made by mutual consent or agreement of the parties, did not change the effect of the above-mentioned provision of the contract.

The rules of the interstate-commerce commission as to safety valves, placards, dome cards, and the mechanical arrangement for closing the dome cover on tank-cars containing gasoline, etc., violation of which in this case is the negligence complained of as having caused the destruction of the plaintiffs' plant by fire from an explosion occurring while a tank-car was standing on the spur-track, govern shipments while in transit, and did not apply after the car had been placed on the spur-track and there delivered to the consignee.

The court erred in overruling the general demurrer to the petition.

DECIDED JULY 10, 1923.

Action for damages; from Spalding superior court — Judge Searcy.   December 6, 1922.

Certiorari was granted by the Supreme Court.

The judge of the superior court, in his judgment on the demurrers, held that the acts complained of constitute actionable negligence, and said: "It seems to me, beyond any doubt, that the contracts are not void for any reasons urged against their validity by the plaintiffs; and if the action was one between the parties to those contracts, clearly the plaintiffs' cause of action and right to recover would be barred thereby; but, since the conclusion is reached that the removal of the track from its original location under the contracts, without any agreement that the contracts should apply to the new track, operated to relieve the new track and Gossett from the effect of the indemnity clause of the contracts, and further that the contracts were never assigned in compliance with law to the defendant, nor the duties and obligations imposed by the contracts on the railway company unconditionally and fully assumed by the defendant, it is immaterial to the determination of the question at bar whether the contracts are void or not. It follows from the foregoing that the general demurrers should be and they are overruled."

*Cleveland, Goodrich & Cleveland,* for plaintiff in error.

*Reuben R. Arnold, Lowry Arnold, Beck & Beck,* contra.

LUKE, J.   A. F. Gossett & Sons sought to recover damages from the director-general of railroads, operating the railway lines of the Central of Georgia Railway Company. The allegations of the petition were in substance as follows:. The partnership of Gossett & Sons were operating a fertilizer plant in Griffin, Ga., along the line of the Central of Georgia Railway Company. Branching off from the main line of the railway company there was a private spur or side-track, over which cars of material to be used in the

37

fertilizer plant were placed for unloading by them; also over this private spur or side-track empty cars were placed, and materials manufactured in the plant were loaded, and from there delivered to the Central of Georgia Railway Company for transportation. On May 19, 1907, A. F. Gossett entered into a contract with the Central of Georgia Railway Company for the construction of a spur-track. A. F. Gossett & Sons were successors in title to the plant of A. F. Gossett, and succeeded to the use of the spur-track. The contract went into elaborate details as to the construction and location, and the exact metes and bounds were minutely shown for the construction of the spur-track, over the lands of Gossett, from whom, by the terms of the contract, an easement was granted to the railway company. One of the provisions of the contract was as follows: "The tenant [Gossett] shall indemnify, save, and hold harmless the railway company, its successors or assigns, from any and all loss, damage, injury, liability, or expense that may accrue to or against it by reason of the destruction of or injury to any buildings, improvements, or any personal property belonging to the tenant, situated upon, or being at or upon said track or right of way, or upon the plant of the tenant, or adjacent thereto, by fire or from any other cause whatsoever," etc. Subsequently there was another spur-track contract, whereby the original spur-track was to be extended 80 feet in length; and this contract contained the same provisions and stipulations as to the tenant holding harmless and indemnifying the railway company from loss or liability by reason of the destruction of the property of the tenant by fire or from any other cause, whether attributable to negligence of the railway company or its employees. Subsequently, but without having entered into any further written contract, plaintiffs and the Central of Georgia Railway Company agreed that the spur-track of 460 feet should be extended an additional distance of 40 feet, and also, by mutual arrangement between the parties, the location of the entire spur-track was changed, it being moved in its entirety a distance of 23 feet eastward. Subsequently, instead of extending the track only 40 feet, the parties agreed in writing that the track be extended 60 feet, and that the construction and the extension of said 60 feet should "be subject in all respects to all the covenants, conditions, and obligations contained in said original agreement of March 9, 1907,

as fully and specifically as if all of said covenants, conditions and obligations were set out herein at length." It was alleged that the new construction of the spur-track entirely changed its location with reference to the buildings and premises, entirely changed the risk, and made an entirely new and different track in a different location, so that the subject-matter of the original contract was completely destroyed. It was further alleged, that, subsequently to the last-mentioned extension of the spur-track, the parties entered into a verbal agreement, without any stipulation as to liability or non-liability, for an additional extension of 33 feet to the spur-track. The destruction of the property by fire, as sued for, occurred on the spur-track after all these extensions, renewals, and changes.

It was alleged that in an ordinary tank-car in good condition there was shipped from Delaware, Oklahoma, to Anderson Gustafson Company, at Whiting, Indiana, a quantity of casinghead gas, which is a liquid condensate from natural gas, highly explosive and dangerous. Anderson Gustafson Company caused the car to be shipped to Cordele, Georgia, to their own order, S. J. Herrington to be notified. The bill of lading issued by the railroad company at Whiting, Indiana, for the shipment by Anderson Gustafson Company bears the following notation: "Inflammable placards and dome cards applied." At Cordele, Georgia, the car was reconsigned to Griffin, Georgia, to the order of said S. J. Herrington, Gossett Oil Company to be notified. The same billing was used, the railroad company at Cordele merely inserting the name of the new consignor, consignee, and destination, and striking out the old. Before delivery of the car at Griffin the so-called infammable placards and dome cards were either lost or removed, and there was nothing on the car to indicate its contents except a small tag attached to the wooden sill, bearing the word "Gasoline." At Griffin the car, together with another of like nature, was delivered to the Gossett Oil Company by being placed on a private spur or side-track of the plaintiffs, known as the Gossett side-track. After its delivery, thinking that it contained straight-run gasoline, such as had been ordered, certain employees of the Gossett Oil Company went upon the car for the purpose of taking a sample, and partly unscrewed, but did not wholly loosen, the dome cap, and, without accomplishing their purpose, for some undisclosed

reason left the car. Shortly thereafter the pressure in the car caused the cap of the dome to blow off, the vapor spreading over the surrounding territory, causing an explosion and setting fire to the plaintiff's property, and thus causing the damage complained of.

It was further alleged: that the interstate-commerce commission is authorized by Congress to formulate regulations for the safe transportation of explosives in accord with the best-known practicable means for securing safety in transit, governing the packing, marking, loading, handling while in transit, and the precautions necessary to determine whether the material when offered is in proper condition to transport and pursuant thereto, for the handling of shipments of the character in question, and that the interstate-commerce commission has promulgated the following rules, which were in effect at the time of the shipment in question, the director-general of the railroads having expressly adopted them: " Carriers that are subject to the act to regulate commerce must not receive shipments of articles defined as dangerous by these regulations when the shipments are not packed, marked, labeled, described, and certified as prescribed herein. The method of manufacture and packing of articles defined as dangerous by these regulations, so far as it affects safe transportation, must be open to inspection by a duly authorized representative of the initial carrier or of the bureau of explosives." " Liquid condensates from natural gas or from casinghead gas of oil wells, made either by the compression or absorption process, alone or blended with other petroleum products, must be described as liquefied petroleum gas when the vapor pressure at 100 degrees Fahrenheit (90 degrees Fahrenheit November 1 to March 1) exceeds 10 pounds per square inch." In the instant case the pressure in the car exceeded 10 pounds to the square inch. " When the liquid condensate alone or blended with other petroleum products has a vapor pressure not exceeding 10 pounds per square inch, it must be described as gasoline or casinghead gasoline," and " must be shipped in metal drums or barrels complying with Specification No. 5; or in ordinary tank-cars, 60 pounds test class equipped with mechanical arrangement for closing of dome covers as specified in Master Car Builders' specification for tank-cars." " Every tank-car containing liquid condensates, either blended or unblended, including

liquefied petroleum gas as defined herein, must have safety valves
set to operate at 25 pounds per square inch with a tolerance of 3
pounds above or below, and the mechanical arrangements for clos-
ing the dome covers of such cars must either be such as to make it
practically impossible to remove the dome cover while the interior.
of the car is subjected to pressure; or suitable vents that will be
opened automatically by starting the operation of removing the
dome cover must be provided." " The shipper must attach secure-
ly and conspicuously to the dome and dome cover three special
white dome placards measuring 4 x 10 inches, bearing the follow-
ing words: ' Caution. Avoid accidents. Do not remove this
dome cover while gas pressure exists in tank. Keep lighted lan-
terns away.' " " One placard must be attached to each side of the
dome and one placard must be attached to the dome cover. The
presence of these special dome placards must be noted on the ship-
ping order by the shipper and by the carrier on the billing accom-
panying the car. Placards must conform to samples furnished
by the chief inspector of the bureau of explosives."

The petition charged, as negligence .on the part of the railroad
company, failure to comply with the rules of the interstate-com-
merce commission in that it (a) allowed said inflammable placards
to be removed; (b) it allowed said dome cards to be removed; (c)
it did not have the car equipped with safety valves set to operate
at a certain pressure; and (d) it did not have the mechanical
arrangement for closing the dome cover. This is the only negli-
gence complained of. To this petition the defendant demurred
generally and specially. The court overruled the demurrer. The
question presented by the writ of error is whether the petition set
forth a cause of action.

It was error for the court to overrule the general demurrer to
the petition. The plaintiffs (defendants in error) contend that
the written contract between them and the railway company under
which the spur-track was built is no defense. They contend that
because the contract was between them and the railway company
and not with the government, there is no privity as to the director-
general. They further contend that there had never been any as-
sumption by the director-general of the obligations under the
several contracts for the building of the spur-tracks. We do not
agree to the soundness of either of these contentions. As for one

of the reasons: it is provided in the order of the director-general as to the use of spur-tracks that " where industry tracks are covered by written contracts, such contracts shall be adhered to until otherwise ordered." The several contracts between the railway company and Gossett & Sons are not void as being against public policy. See *Hearn* v. *Central of Ga. Ry. Co., 22 Ga. App.* 1 (95 S. E. 368) ; *Blitch* v. *Central of Ga. Ry. Co., 122 Ga.* 711 (50 S. E. 945) ; *Holly* v. *So. Ry. Co.,* 119 *Ga.* 767 (47 S. E. 188) ; 70 L. R. A. 930 ; 45 L. R. A. 380 ; 44 L. R. A. (N. S.) 1127 ; *Dowman Dozier Mfg. Co.* v. *Central of Ga. Ry. Co., 29 Ga. App.* 187 (114 S. E. 815). In our opinion, the director-general, in assuming the public duties of the Central of Georgia Railway Company, stood in the place of the railway company in the matter of the contracts by which the railway company constructed the spur-tracks here. Indeed, his order in the mater of spur-tracks indicated an assumption of all the obligations under the contracts. In order for Gossett & Sons to escape the provisions of the contract, it must of necessity be shown that the director-general unconditionally refused to be bound under the terms of the contract. The director-general was just as much bound to deliver goods upon this spur-track as was the Central of Georgia Railway Company before Federal control. Gossett & Sons were just as much bound by the terms of the contract during Federal control as before Federal control.

The contention that the spur-track was changed 23 feet eastward and extended in length at different times does not change the effect of the indemnity contract pleaded in the petition. All of the changes were made by mutual consent and under express verbal agreements between the parties.

The alleged violation of the rules of the interstate-commerce commission was not actionable negligence. The rules of the interstate-commerce commission pleaded by the plaintiffs were prescribed for certain declared purposes, viz. : (*a*) " to promote the uniform enforcement of law and to minimize the ·dangers to life and property incident to the transportation by land in interstate commerce of dangerous articles other than explosives ;" (*b*) " to define these articles for freight-transportation purposes," and (*c*) " to state the precautions that must be observed by the shipper in preparing them for shipment, and by the carrier while handling

them in transit." The manifest purpose, then, of the congressional authority in the premises and of the rules promulgated by the commission in pursuance of that authority is, not the protection or advantage of either the shipper or the consignee, but solely the protection and safety of railway employees and of the public from any accidents arising from the movement of shipments defined as dangerous, during the course of their transportation from one point to another.

Of course, there can be no negligence on the part of one who has omitted no legal duty, nor invaded the rights of another. Has the defendant, under the facts alleged, omitted any legal duty owing to the plaintiffs, or in any way invaded their rights? We think not. The interstate-commerce commission has only such powers as are delegated to it by Congress; and the act of March 4, 1909, empowers it only to formulate rules and regulations governing shipments *in transit*. And the commission in all the rules quoted makes no pretense of having any other authority, but expressly declares that the rules are to govern shipments " while in transit." Goods are " in transit " so long as they are on their passage and until they come into the actual or constructive possession of the vendee or some person acting for him. Moore *v*. Lott, 13 Nev. 376 (383). " In transit " means literally in course of passage from one point to another, and such is its common acceptation. Cotton still remaining on a compress company's platform, for which a railroad company has executed a bill of lading providing that the company shall be liable for loss or damage to the cotton while in transit, is not in transit so as to bind the company. Amory Mfg. Co. *v*. Gulf, C. & S. F. Ry. Co., 89 Tex. 419 (37 S. W. 856; 59 Am. St. R. 65) ; Gulf, C. & S. F. Ry. Co. *v*. Pepperrell Mfg. Co., (Tex.) 37 S. E. 965. In the case here the shipment had been delivered to the consignee and actually taken possession of by its employees, and the rules of the interstate-commerce commission had ceased to have any application. It is a duty owing by a carrier to a consignee to safely transport his shipment, and deliver it in good condition. There is no obligation upon a carrier to notify the consignee of the contents of his shipment or to employ the most approved safety devices. The consignee may be presumed to know the contents of his shipment and expected to

govern himself accordingly. From what we have said it follows that the plaintiffs could not have recovered upon the acts of negligence charged in their petition.

*Judgment reversed. Bloodworth, J., concurs. Broyles, C. J., disqualified.*