Jeremiah **CROCKETT**, et al.,
**Plaintiffs-Appellees,**

v.

**UNIROYAL, INC.,** et al.,
**Defendants-Appellants,**

**Southern Railway Co., Seaboard System Railroad, Inc., etc.,**
**Defendants-Appellees.**

**Southern Railway Co., Third-Party Plaintiff-Appellee.**

Erma **CROCKETT, Plaintiff-Appellee,**

v.

**UNIROYAL, INC.,** et al.,
**Defendants-Appellants,**

**Southern Railway Co., Seaboard System Railroad, Inc., etc.,**
**Defendants-Appellees,**

**Southern Railway Co., Third-Party Plaintiff-Appellee.**

No. 84–8690.

United States Court of Appeals,
Eleventh Circuit.

Oct. 7, 1985.

---

David M. Brown, Sandra Kaye, Atlanta, Ga., for Uniroyal, Inc.

William J. McKenney, Atlanta, Ga., Carr G. Dodson, Robert C. Norman, Jones, Cork & Miller, F. Kennedy Hall, Stephen Stewart, Hall, Bloch, Garland & Meyer, Macon, Ga., Arthur H. Glaser, G. Randall Moody, Drew, Edkl & Farnham, Atlanta, Ga., for Jeremiah Crockett, Erma Crockett, South-

ern Ry. Co. and Seaboard System Railroad Inc.

Before RONEY and HILL, Circuit Judges, and PITTMAN *, District Judge.

JAMES C. HILL, Circuit Judge:

This case was initiated by complaints filed by Jeremiah Crockett and Erma Crockett against Uniroyal, Inc. ("Uniroyal"), Seaboard System Railroad, Inc., ("Seaboard") and Southern Railway Company ("Southern"). (Seaboard and Southern are referred to collectively as "the railroad defendants"). The instant appeal arises from a series of orders entered by the district court dismissing the railroad defendants, holding them not liable to the plaintiffs, and granting summary judgment in favor of the railroad defendants against Uniroyal on Uniroyal's cross-claim for indemnity or contribution.

## FACTS

Uniroyal, through its wholly owned subsidiary, Alpine Laboratories, Inc. ("Alpine"), manufactures a poison called substituted nitrophenol pesticide liquid ("substituted nitrophenol"). In early 1982, four tank cars leased from General American Transportation Company ("GATC"), GATC 37819, 75680, 63506 and 63457, were filled with substituted nitrophenol and shipped from Uniroyal's Alpine plant in Bay Minette, Alabama to Uniroyal's plant in Gastonia, North Carolina. The tank cars were unloaded, inspected, and marked "empty" by Uniroyal officials in Gastonia. The cars were then placarded to show "empty," and their manways, openings giving access to the interior of the cars, were bolted shut. In this condition the cars were returned to Uniroyal's plant in Bay Minette.

Alpine contacted Railcar Services (Railcar), located in Gordon, Georgia, and arranged for the cars to be steamed cleaned. In March, 1982, two tank cars, GATC 37819 and 75680, were shipped from Bay Minette, Alabama to Gordon, Georgia. The cars were transported by Seaboard from Bay Minette to Atlanta. Southern then picked up the rail cars and transported them from Atlanta to Gordon, Georgia. The two cars were cleaned without incident and returned to Alpine in July, 1982.

Alpine later contacted Seaboard regarding the shipment of the remaining two tank cars, GATC 63506 and 63457, to Railcar to be cleaned. Seaboard prepared the waybill for the tank cars.[1] That waybill was delivered by Seaboard to Seaboard's connecting carrier, Southern. The information upon which the waybill was based was information given to Seaboard by Alpine. Among notations on the waybill were the following items: (1) that each railcar was empty; (2) that the cars were shipped by Alpine Labs in Bay Minette, Alabama; (3) that the cars last contained substituted nitrophenol and were placarded "poison."

The two remaining tank cars, GATC 63506 and 63457, were again shipped by Alpine through Seaboard from Bay Minette to Atlanta.[2] Southern picked up the cars in Atlanta, transported them to Gordon, and delivered them to Railcar on July 30, 1982. In accordance with industry practice, Southern did not give Railcar a copy of the waybill.

On August 2, 1982, Jeremiah and Shedrick Crockett, Railcar employees, were instructed to steam clean GATC 63457. They did so, Shedrick Crockett steam cleaning the inside of the tank car, Jeremiah Crockett working on the outside. Both men became ill during the process. Shedrick Crockett later died. Jeremiah Crock-

---

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. A waybill is a written document filled out by the carrier listing the point of origin and destination, consignor and consignee, and describing the goods included in the shipment. A waybill is delivered to connecting carriers for the purpose of instructing each railroad as to the route and destination of the car.

2. At all times during the shipment the two cars bore a placard showing that each car was empty, a placard with a skull and crossbones, a United Nations number 2779, indicating the type of chemical the car had carried, and the number 6, indicating poison.

ett survived with injuries. It is undisputed that the cause of death and injury was exposure to substituted nitrophenol.

## PROCEEDINGS IN THE DISTRICT COURT

On September 2, 1983, plaintiffs, Jeremiah Crockett and Erma Crockett, filed separate suits against Uniroyal, Inc., Southern Railway Co., and Seaboard System Railroad, Inc. seeking, respectively, recovery for Jeremiah Crockett's injuries and the wrongful death of Shedrick Crockett. These separate actions were consolidated by order of the district court.

Plaintiffs alleged that Jeremiah and Shedrick Crockett, as employees of Railcar, were injured while cleaning a tank car operated by Uniroyal. Plaintiffs claimed that Uniroyal (1) failed to provide the proper notice regarding the dangerous nature of the substance last contained in the car, (2) failed to follow DOT and EPA regulations regarding placards and manifests, and (3) misrepresented the propensities of the chemical last contained in the car. Plaintiffs claimed that Seaboard and Southern (1) failed to follow DOT and EPA regulations, and (2) failed to inspect the cars, require proper manifest documents, and place proper placards prior to and during the transportation. In their answers, the railroad defendants filed cross-claims against Uniroyal for contribution or indemnity. Defendant Uniroyal subsequently filed cross-claims for contribution or indemnity against the railroad defendants.

At a pretrial conference, plaintiff's counsel stated he could not prove Southern's negligence. The court thereafter entered an order and judgment on April 16, 1984 dismissing Southern as a party in plaintiff's complaint. The order and judgment stated that Southern should remain as a defendant to Uniroyal's cross-claim.

Southern subsequently filed a motion for summary judgment on Uniroyal's cross-claim for indemnity or contribution. Seaboard filed a summary judgment motion on both plaintiffs' claim for negligence and Uniroyal's cross-claim for contribution or indemnity. The district court, by order dated July 19, 1984, 592 F.Supp. 821, granted Seaboard's summary judgment motion on plaintiffs' claim and Uniroyal's cross-claim, and granted Southern's summary judgment motion on Uniroyal's cross-claim. The court's order of August 9, 1984 directed that final judgment be entered "on all claims adjudicated by the July 19, 1984 order." The court issued another order on August 9, 1984, apparently because some depositions were not on file when the July 19, 1984 summary judgment was granted. The court stated in its August 9, 1984 order that these depositions "in no way" affected his prior order. Final judgment was entered by the clerk on August 10, 1984.

This appeal was filed by Uniroyal on August 22, 1984. The appeal is from the district court's grant of summary judgment in favor of Seaboard and Southern and against Uniroyal on Uniroyal's contribution or indemnity claim. An issue exists as to whether Uniroyal has properly appealed the district court's grant of summary judgment in favor of Seaboard on the plaintiff's complaint.

Oral argument was had in this case on March 26, 1985. In the interim, and pursuant to this court's request, counsel for Uniroyal has advised us that his client has entered into a compromise agreement with the plaintiffs. However, that compromise was based upon an express reservation of all rights which Uniroyal may have to indemnity or contribution from the railroad defendants, Southern and Seaboard. Because those rights are the subject of the present Rule 54(b) appeal, the action before us is not moot and will be addressed in full.

We review the district court's grant of summary judgment. Accordingly, we must view any inferences to be drawn from the evidence in support of that motion in the light most favorable to Uniroyal. *Bingham, Ltd. v. United States,* 724 F.2d 921, 924 (11th Cir.1984). To the extent that summary judgment is based upon the district court's conclusions of law, those conclusions will be "subject to the same standard of appellate review as any question of law raised upon appeal," *Morrison v. Washington County, Alabama,* 700 F.2d

678 (11th Cir.1983), a plenary review of correctness by this court. *See Federal Deposit Insurance Corp. v. Dye,* 642 F.2d 837, 841 (5th Cir. Unit B 1981). Additionally, because this case arises on appeal from a diversity action brought in federal court in Georgia, we decide substantive issues on the basis of Georgia law and procedural issues on the basis of federal procedural law. *See e.g.,* 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4509 (1982).

## THE EFFECT OF PRIOR RULINGS IN THIS CASE

An initial argument brought both by Southern and Seaboard is that, for differing reasons, the appellant is precluded from asserting the liability of the railroad defendants for indemnity or contribution. The preclusion assertedly arises out of prior rulings of the district court effectively determining on the merits that the railroad defendants are not liable to plaintiffs in negligence. The railroad defendants argue that the finding of no negligence as between themselves and the plaintiffs is a conclusive determination of no joint negligence as between the railroad defendants and Uniroyal. We examine these claims individually.

### Seaboard

Seaboard's principal argument on this point is that Uniroyal has not appealed from the determination of the trial court that Seaboard was not negligent in performing its duty to the plaintiffs. Under Georgia law defendants are joint tortfeasors when separate and distinct acts of negligence on their parts concur as the proximate cause of an injury. *Reeves v. McHan,* 78 Ga.App. 305, 307, 50 S.E.2d 787, 789 (1948). In the absence of an issue as to Seaboard's liability to the plaintiffs, there

can be no joint liability, hence no liability for indemnity or contribution to Uniroyal. The gist of the claim is therefore that Uniroyal failed to preserve the issue of its entitlement to indemnity or contribution because it failed to appeal the question of Seaboard's negligence vis-a-vis the plaintiffs. We do not accept this argument. While it may be true that Uniroyal did not specifically enumerate as error the trial court's grant of summary judgment in favor of Seaboard against plaintiffs' negligence claims, it is nevertheless clear that the substance of Uniroyal's appeal, the railroad's liability for indemnity or contribution, necessarily includes the question of Seaboard's negligence to the plaintiffs. Uniroyal noted this issue in its notice of appeal,[3] and all parties have, in briefing the issue of liability for indemnity or contribution, extensively argued the question of the railroads defendants' liability to the plaintiffs. We therefore find that the issue of Seaboard's liability to Uniroyal for indemnity or contribution is properly before us.

### Southern

A more credible variation on this theme is presented by Southern. Starting once again from the basic premise that the right of indemnity or contribution stems from a finding of joint liability between two or more tortfeasors and the cross-claimant, Southern argues that the April 16, 1984 order of the district court, in which the district court entered final judgment dismissing Southern from the case, precludes the issue of joint liability and therefore, the issue of Southern's liability for indemnity or contribution to Uniroyal. While this argument at first appears correct, an examination of the order in question clearly demonstrates that it is untenable.

The district court's order of April 16, 1984 provided in pertinent part as follows:

---

**3.** Uniroyal's notice of appeal filed with this court stated as follows:

Notice is hereby given that defendant Uniroyal, Inc. appeals to the United States Court of Appeals for the Eleventh Circuit from the final judgment entered in this action on August 10, 1984 and the orders of July 19, 1984 and August 9, 1984. The order of July 19, 1984 granted summary judgment in favor of

defendant Seaboard System Railroad, Inc. and Southern Railway Company and against plaintiffs as well as against defendant Uniroyal, Inc. on its cross-claims. The order of August 9, 1984 found no just reason for delay and directed that final judgment be entered pursuant to Fed.R.Civ.P. 54(b) on all claims adjudicated in the order of July 19, 1984. Record on Appeal at 476–77.

IT IS THEREFORE ORDERED AND ADJUDGED, that Southern Railway Company is hereby dismissed as a defendant to the plaintiffs' complaint in this action. *Southern Railway Company shall remain as a defendant to the cross-claim of defendant Uniroyal pending the future determination of this Court.*

Pursuant to Rule 54(b), the court has expressly determined that, under the circumstances, there is no just reason for delay in the entry of a final judgment on this Order. Accordingly, the Clerk of this Court is hereby directed to enter a final judgment upon this order dismissing Southern Railway Company as a party defendant to the plaintiffs' complaint in this action as provided in said Rule.

Record on Appeal at 244 (emphasis added).

■ This order clearly disposed of the issue of Southern's liability to the plaintiff. That disposition was uncontrovertably final and on the merits.[4] It is, however, equally clear that the order of April 16, 1984 was *not* a final decision on the merits of Uniroyal's right to pursue a claim against Southern for contribution or indemnity. In the first instance, had Uniroyal appealed from this order, as Southern now suggests it must have done in order to preserve the issue, Uniroyal would have been properly met with the observation that the disputed issue of liability was not final, the trial judge having expressly retained that claim subject to future determination. Moreover, the issue of Uniroyal's right to claim indemnity from Southern might not be foreclosed because it is entirely conceivable circumstances might exist under which, although the plaintiff might not successfully sue Southern, Uniroyal might do so on an indemnity theory.[5]

■ Southern's argument is therefore that Uniroyal, in order to preserve its rights, should have not only pursued its

claim for indemnity or contribution, but also appealed the plaintiff's claim of liability. We decline to impose such a burden. It is enough that Uniroyal pursued its own claims for indemnity and contribution and appealed those claims at the time the district court determined them to be fully and finally adjudicated on the merits. That final adjudication came in the trial court's order of August 10, 1984 pursuant to the court's finding that there was no just reason for delay and his entry of final judgment under rule 54(b) on the issue of the railroads' liability to Uniroyal for indemnity and contribution. We therefore find the appeal from the court's summary judgment in favor of Southern to be properly before us as well.

## II. POTENTIAL LIABILITY OF THE RAILROAD DEFENDANTS FOR INDEMNITY OR CONTRIBUTION

We reiterate that, because of the summary posture of this case, the question for our decision on the substantive issue of indemnity or contribution is whether, as a matter of Georgia law, Uniroyal is precluded from bringing a claim for either indemnity or contribution against either Seaboard or Southern. As stated previously, we assume all facts alleged by Uniroyal to be true and draw any inferences arising from those facts in Uniroyal's favor.

■ Under the facts as alleged, a claim for indemnity or contribution may be entertained unless, as a matter of Georgia law, there is no actionable negligence on the part of the railroads. *Southern Railway Co. v. Brewer*, 122 Ga.App. 292, 293, 176 S.E.2d 665, 666 (1970) (contribution); *Central of Georgia Railway Co. v. Lester*, 118 Ga.App. 794, 801–02, 165 S.E.2d 587, 591–92 (1968) (indemnity). The nature of the action which may be brought depends upon the character of the negligence involved. If it may be demonstrated that one party was actively negligent in the face of

---

4. Indeed, the plaintiffs' admission of inability to pursue a claim against Southern prevents the plaintiffs from appealing that issue, it being a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party. *Cf., Unit-*

*ed States v. Males,* 715 F.2d 568, 571 (11th Cir. 1983).

5. A contractual indemnity agreement would be one example. Such a circumstance is not presented here.

the other party's passive negligence, an action for indemnity lies. *Colt Industries Operating Corp. v. Coleman,* 246 Ga. 559, 560, 272 S.E.2d 251, 253 (1980). If both parties are demonstrably negligent but no apportionment of relative negligence may be made, the claim is one for contribution. Ga. Code Ann. § 51–12–32(a) (1982); *Colt Industries,* 256 Ga. at 560, 272 S.E.2d at 252. The preclusion of negligence as a matter of law depends upon whether, under the facts alleged, there arose a duty in the railroad defendants to warn the consignee of the railroad car of a potential danger existing in the handling of that car. Our inquiry must thus focus upon the existence or nonexistence of such a duty.

Uniroyal argues that the information it supplied Seaboard, from which Seaboard prepared the waybill, and the waybill itself, supplied by Seaboard to Southern, put both railroad defendants on notice of a dangerous condition inhering in the railcar. The contention is therefore that liability arose from the general duty of one with superior knowledge, actual or constructive, of a dangerous condition to warn one without such knowledge. *Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 201, 296 S.E.2d 693, 695 (1982). *See also Everhart v. Rich's, Inc.,* 229 Ga. 798, 802, 194 S.E.2d 425, 428 (1972). Additionally, Uniroyal argues that under Georgia law initial and ultimate rail carriers owe a duty to the consignee and its employees to see that the rail cars are reasonably safe for unloading, or, as in this case, cleaning. *Atlanta & West Point Railroad Co. v. Creel,* 77 Ga.App. 77, 81, 47 S.E.2d 762, 766 (1948).

The undisputed facts are that Uniroyal advised the railroads the cars, then empty, last contained a poisonous substance. The real issue is therefore not the factual one of whether the railroad defendants had superior knowledge of a dangerous condition, but the legal one of whether Georgia law will require a carrier to assimilate known facts, that the car last contained poison, and that a car which last contained poison would presently contain a residue of that poison, and conclude from this assimilation that the car was dangerous. We do not believe that such a duty is imposed under Georgia law.

The duty owed by carrier to a consignee is to transport the shipment safely and deliver it in good condition. *Davis v. Gossett & Sons,* 30 Ga.App. 576, 118 S.E. 773 (1923), *aff'd,* 158 Ga. 886, 124 S.E. 529 (1924). The carrier must make an inspection of the exterior of the railroad car to ascertain whether the car and its unloading devices are reasonably safe. If upon such an examination it is discovered that the car or any part of its unloading devices is not reasonably safe, the carrier should make the necessary repairs, correct the unsafe condition, or notify the consignee of the defect. *Butler v. Central of Georgia Railway Co.,* 87 Ga.App. 492, 74 S.E.2d 395 (1953). We believe these cases illustrate the principle that a carrier will be put to a duty to perform tasks within his expertise to insure the reasonable safety of transport and delivery. He will not, and should not, be required to examine information about the content of the shipment entrusted to him and warn the ultimate consignee of that shipment of any potential dangers arising from the nature of the cargo. We therefore hold that under the facts as presented the railroad defendants were not required to conclude the railcar was dangerous. There was therefore no duty to warn arising in them because of superior knowledge of the dangerous condition. Hence there was no negligence under this argument as a matter of law.

Uniroyal also argues that the defendant, Seaboard, by undertaking to prepare shipping documents "as a courtesy" to Uniroyal, was liable for its failure to apprise Railcar Services of the danger inhering in the car. The source of duty here is specific. One who undertakes to perform a task must perform it in a non-negligent manner. Restatement (Second) of Torts § 324A;[6] *Huggins v. Aetna Casualty & Surety Co.,* 245 Ga. 248, 264 S.E.2d 191 (1980). *See also Georgia-Carolina Brick*

**6.** That section provides:

Liability to third person for negligent performance of undertaking. One who under-

*& Tile Co. v. Brown,* 153 Ga.App. 747, 755, 266 S.E.2d 531, 539 (1980); *Mixon v. Dobbs House, Inc.,* 149 Ga.App. 481, 254 S.E.2d 864 (1979); *Sims v. American Casualty Co.,* 131 Ga.App. 461, 206 S.E.2d 121, *aff'd,* 232 Ga. 787, 209 S.E.2d 61 (1974).

It is undisputed that Seaboard undertook to prepare the waybill by which the rail car was transmitted. As we view it, the central question here is again a legal one, whether the task undertaken by Seaboard was of such a character that, had it been performed in a nonnegligent manner, notice of the dangerous condition would or should have been given to the consignee. In the language of the Second Restatement of Torts, we must ask whether Seaboard should have recognized that inclusion of a warning of the potential hazard contained in the railcars was "necessary for the protection of a third person." We look to the nature of the task undertaken, the preparation of shipping documents for the transmittal of the railcar.

 Under Georgia law a consignee is presumed to know the content of the shipment he receives. *Davis v. Gossett & Sons,* 30 Ga.App. at 583–84, 118 S.E. at 777. Any necessary warnings as to the

potential hazard inhering in the content of a shipment should be made by the shipper directly to the consignee. *Id.* The duty imposed upon Seaboard was therefore the non-negligent preparation of a waybill, not the inclusion within that waybill of instructions and warnings as to the proper handling of the shipment itself. The carrier in this case did not undertake to warn the consignee. The carrier was entitled to presume that the shipper had communicated the purpose of the shipment to the consignee and had given all appropriate warnings to the consignee for the safe accomplishment of that purpose. There is therefore no liability under this theory.

Finally, Uniroyal argues that a duty to warn was imposed upon the railroads under federal regulations promulgated by the Environmental Protection Agency ("EPA") and the Department of Transportation ("DOT") governing the transportation of hazardous waste matter. Although the applicability of these regulations is disputed [7] and their admissibility is an open question, we assume for purposes of argument that the regulations would apply.

EPA regulation 40 C.F.R. § 263.20 [8] governs the record keeping required by the

---

takes, gratuitously or for a consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking. If (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Restatement (Second) of Torts § 324A.

7. The district court expressly declined to determine the admissibility of these regulations. Likewise declining to decide this issue, we assume for purposes of argument that the regulations might apply and examine them to determine whether, as a matter of law, a duty to warn would exist under the facts of this case.

8. § 263.20 The manifest system.
 (a) A transporter may not accept hazardous waste from a generator unless it is accompanied by a manifest, signed by the generator in accordance with the provisions of 40 CFR Part 262.

(b) Before transporting the hazardous waste, the transporter must sign and date the manifest acknowledging acceptance of the hazardous waste from the generator. The transporter must return a signed copy to the generator before leaving the generator's property.
 (c) The transporter must ensure that the manifest accompanies the hazardous waste.
 (d) A transporter who delivers a hazardous waste to another transporter or to the designated facility must:
 (1) Obtain the date of delivery and the handwritten signature of that transporter or of the owner or operator of the designated facility on the manifest; and
 (2) Retain one copy of the manifest in accordance with § 263.22; and
 (3) give the remaining copies of the manifest to the accepting transporter or designated facility.
 (e) The requirements of paragraphs (c), (d), and (f) of this section do not apply to water (bulk shipment) tranporters if:
 (1) The hazardous waste is delivered by water (bulk shipment) to the designated facility; and
 (2) A shipping paper containing all the information required on the manifest (exclud-

EPA for the transportation of hazardous waste. That section provides that, for certain designated waste materials, a transporter may not accept those materials for transportation unless they are accompanied by a hazardous waste manifest in accordance with the provisions of 40 C.F.R. § 262. It is undisputed in this case that no hazardous waste manifest was prepared. We look to see whether such a manifest was required.

Residual waste is dealt with in EPA regulation, 40 C.F.R. § 261.7. That section provides as follows:

> Residues of hazardous waste in empty containers.
>
> (a)(1) Any hazardous waste remaining in ... an empty container ..., as defined in paragraph (b) of this section, is not subject to regulation under Parts 261–265, or Part 270 or 124 of this chapter or

to the notification requirements of section 30.10 of the R.C.R.A.

> (2) Any hazardous waste in ... a container that is not empty ..., as defined in paragraph (b) of this section, is subject to regulation under Parts 261–265, and Part 270 and 124 of the chapter and to the notification requirements of section 30.10 of the R.C.R.A.
>
> (b)(1) A container ... that has held a hazardous waste ... is empty if:
>
> (i) all wastes have been removed that can be removed using the practices commonly employed to remove materials from that type of container, *e.g.*, pouring, pumping, and aspirating, *and*
>
> (ii) no more than 2.5 centimeters (one inch) of residue remain on the bottom of the container ..., *or*
>
> . . . .

ing the EPA identification numbers, generator certification, and signatures) accompanies the hazardous waste; and

(3) The delivering transporter obtains the date of delivery and handwritten signature of the owner or operator of the designated facility on either the manifest or the shipping paper; and

(4) The person delivering the hazardous waste to the initial water (bulk shipment) transporter obtains the date of delivery and signature of the water (bulk shipment) transporter on the manifest and forwards it to the designated facility; and

(5) A copy of the shipping paper or manifest is retained by each water (bulk shipment) transporter in accordance with § 263.22.

(f) For shipments involving rail transportation, the requirements of paragraphs (c), (d) and (e) do not apply and the following requirements do apply:

(1) When accepting hazardous waste from a non-rail transporter, the initial rail transporter must:

(i) Sign and date the manifest acknowledging acceptance of the hazardous waste;

(ii) Return a signed copy of the manifest to the non-rail tranporter;

(iii) Forward at least three copies of the manifest to:

(A) The next non-rail transporter, if any; or,

(B) The designated facility, if the shipment is delivered to that facility by rail; or

(C) The last rail transporter designated to handle the waste in the United States;

(iv) Retain on copy of the manifest and rail shipping paper in accordance with § 263.22.

Rail transporters must ensure that a shipping paper containing all the information required on the manifest (excluding the EPA identification numbers, generator certification, and signatures) accompanies the hazardous waste at all times.
Note: Intermediate rail transporters are not required to sign either the manifest or shipping paper.

(3) When delivering hazardous waste to the designated facility, a rail transporter must:

(i) Obtain the date of delivery and handwritten signature of the owner or operator of the designated facility on the manifest or the shipping paper (if the manifest has not been received by the facility); and

(ii) Retain a copy of the manifest or signed shipping paper in accordance with § 263.22.

(4) When delivering hazardous waste to a non-rail transporter a rail transporter must:

(i) Obtain the date of delivery and the handwritten signature of the next non-rail transporter on the manifest; and

(ii) Retain a copy of the manifest in accordance with § 263.22.

(5) Before accepting hazardous waste from a rail transporter, a non-rail transporter must sign and date the manifest and provide a copy to the rail transporter.

(g) Transporters who transport hazardous waste out of the United States must:

(1) Indicate on the manifest the date the hazardous waste left the United States; and

(2) Sign the manifest and retain one copy in accordance with § 263.22(c); and

(3) Return a signed copy of the manifest to the generator.

**1534**

(iii)(B) No more than 0.3 percent by weight of the total capacity of the container remains in the container ... if the container is greater than 110 gallons in size.

40 C.F.R. § 261.7 (1984). The regulations then go on to allot the burden for making the determination that a solid waste is hazardous within the meaning of the regulations. Under 40 C.F.R. § 262.11, that determination must be made by the person who generates the waste. The DOT regulation at issue, 49 C.F.R. § 172.205,[9] directs preparation of a hazardous waste manifest in accordance with 40 C.F.R. § 262. 49 C.F.R. § 172.205(b) (1984). Under D.O.T. regulation also, then, the initial responsibility for determining whether hazardous waste is present rests with the generator.

 Here the railroad carriers were told by Uniroyal that, although the car last contained substituted nitrophenol, it was presently empty. We find no duty under EPA or DOT regulations which would require the carrier to verify such a representation. Accordingly, we agree with the district court that EPA and DOT regulations do not impose upon a transporter a duty to determine if a hazardous waste is present when the generator states that it is not. As these regulations did not impose a duty on the railroad defendants to warn the consignee of a danger inhering in the railcar, there can be no negligence under this theory, hence no liability to Uniroyal under present facts for indemnity or contribution.

### SUMMARY

In summary, we hold that the issue of the railroad defendants' potential liability for indemnity or contribution to Uniroyal

---

**9.** That section provides:

Hazardous Waste Manifest.

(a) No person may offer, transport, transfer, or deliver a hazardous waste (waste) unless an EPA Form 8700–22 and 8700–22A (when necessary) hazardous waste manifest (manifest) is prepared in accordance with 40 CFR 262.20 and is signed, carried, and given as required of that person by this section.

(b) The shipper (generator) shall prepare the manifest in accordance with 40 CFR Part 262.

(c) The original copy of the manifest must be dated by and bear the handwritten signature of, the person representing:

(1) The shipper (generator) of the waste at the time it is offered for transportation, and

(2) the initial carrier accepting the waste for transportation.

(d) A copy of the manifest must be dated by, and bear the handwritten signature of the person representing:

(1) Each subsequent carrier accepting the waste for transportation, at the time of acceptance, and

(2) The designated facility receiving the waste, upon receipt.

(e) A copy of the manifest bearing all required dates and signatures must be:

(1) Given to a person representing each carrier accepting the waste for transportation,

(2) carried during transportation in the same manner as required by this subchapter for shipping papers,

(3) given to a person representing the designated facility receiving the waste,

(4) returned to the shipper (generator) by the carrier that transported the waste from the United States to a foreign destination with a notation of the date of departure from the United States, and

(5) retained by the shipper (generator) and by the initial and each subsequent carrier for three years from the date the waste was accepted by the initial carrier. Each retained copy must bear all required signatures and dates up to and including those entered by the next person who received the waste.

(f) The requirements of paragraphs (d) and (e) and of this section do not apply to a rail carrier when waste is delivered to a designated facility by railroad if:

(1) All of the information required to be entered on the manifest (except generator and carrier identification numbers and the generator's certification) is entered on the shipping paper carried in accordance with section 174.-26(c) of this subchapter;

(2) the delivering rail carrier obtains and retains a receipt for the waste that is dated by and bears the handwritten signature of the person representing the designated facility; and

(3) a copy of the shipping paper is retained for three years by each railroad transporting the waste.

(g) The person delivering a hazardous waste to an initial rail carrier shall send a copy of the manifest, dated and signed by a representative of the rail carrier, to the person representing designated facility.

(h) A hazardous waste manifest required by 40 C.F.R. part 262, containing all of the information required by this subpart, may be used as the shipping paper required by this subpart. 49 C.F.R. § 172.205 (1984).

was properly preserved for our review. Reviewing Uniroyal's claims on the merits, we find no duty upon the railroad defendants to warn the consignee of GATC 63457 of any potential hazard involved in the accomplishment of the purpose for which that car was shipped. In the absence of a duty, there can be no claim of negligence brought against the railroads, hence no claim for indemnity or for contribution arising from joint liability. Accordingly, we hold that the claim of Uniroyal against Seaboard and Southern for indemnity or contribution must fail. The judgment of the district court is

AFFIRMED.