827 F.2d 1488
 ARTHUR PEW CONSTRUCTION COMPANY, INC., Plaintiff-Appellant,
v.
FIRST NATIONAL BANK OF ATLANTA, Defendant-Cross Claim
Plaintiff-Appellee,
Lurton E. Lipscomb, Defendant,
William J. Cooney, P.C., and J. Patrick Claiborne,
Defendants-Cross Claim Defendants-Appellees.
 No. 86-8389.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 21, 1987.
 
 William C. Lanham, Clark H. McGehee, Atlanta, Ga., for Arthur Pew const.
 Beverly B. Bates, Atlanta, Ga., for First Nat. Bank.
 Jeff O. Bramlett, George W. Fryhofer III, Atlanta, Ga., for Cooney & Claiborne.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before FAY and KRAVITCH, Circuit Judges, and MORGAN, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 This appeal challenges an order by the United States District Court for the Northern District of Georgia granting a motion for summary judgment in favor of defendants The First National Bank of Atlanta (hereinafter FNBA), William J. Cooney, P.C. (hereinafter Cooney) and J. Patrick Claiborne. The order dismissed state law claims brought by plaintiff Arthur Pew Construction Company (hereinafter Pew) relating to a case under Title 11 of the United States Code. Because a review of the pleadings, depositions and affidavits reveals the existence of genuine issues of material fact with respect to the promissory estoppel and negligence claims brought against FNBA, we reverse and remand those claims for further proceedings.
 
 I.
 BACKGROUND
 
 2
 Pew is a general contractor and is currently a debtor in possession in a Chapter II bankruptcy proceeding in the Northern District of Georgia. In September, 1982, Pew entered into an agreement with Fenwick Associates, Inc. to complete a number of government contracts awarded to Fenwick. Fenwick, a minority owned general contractor, qualified for favorable treatment on government projects under the Small Business Administration Minority Enterprise Sec. 8(a) Program, 15 U.S.C. Sec. 637(a) (1982).
 
 
 3
 Under the terms of the agreement, both Pew and Fenwick shared costs and split profits. Pew borrowed funds from FNBA, a financial institution with which Pew had done business for over thirty years. This loan was secured by an "assignment" of proceeds from Fenwick's government contracts to FNBA's Buckhead branch in Atlanta, Georgia.
 
 
 4
 FNBA officials at the Buckhead branch were intimately aware of Pew's business and familiar with Pew's agreement with Fenwick. Pursuant to the terms of that agreement and the contractual assignment of project proceeds, FNBA officials received the Sec. 8(a) funds directly from federal contracting officials and deposited the payments in an account jointly controlled by Pew and Fenwick. Although Pew was never a named co-owner of the account, it is undisputed that the government funds could not be dispursed without the signatures of designated Pew employees.
 
 
 5
 In July, 1983, a dispute arose between Pew and Fenwick over the disbursement of funds from the Buckhead account. Both companies retained legal counsel. On July 18, 1983, counsel for Fenwick sent a letter to Pew terminating the business agreement with respect to future projects between Pew and Fenwick.
 
 
 6
 On September 6, 1983, Fenwick's president, Lurton Lipscomb, and Fenwick's attorney, Claiborne, who was an employee of Cooney, visited a FNBA branch in Augusta, Georgia and executed new signature cards for the Buckhead account. Without authorization from or notice to any Pew officials, Lipscomb and Claiborne attempted to open a new account at the Augusta branch with funds drawn by a check from the Buckhead account. Because two checks written by Pew employees cleared before the Buckhead branch officials learned of the change in authorized signatures, Lipscomb's $90,000 check drawn from the Buckhead account was returned for insufficient funds. Thereafter, FNBA officials froze the Buckhead account.
 
 
 7
 On September 13, 1983, Harold Hearn, the president of Pew, and his counsel met with Lipscomb and Claiborne. The parties purportedly reached an agreement regarding the disbursement of funds from the Buckhead account and forwarded a letter to FNBA stating the following:
 
 
 8
 The undersigned Fenwick Associates, Inc., and Arthur Pew Construction Co., hereby authorize you to release the freeze or hold on the subject account.
 
 
 9
 * * *
 
 
 10
 All checks on or after September 13, 1983, must have two signatures, one of Thomas A. Fuller, and one representative of Arthur Pew Construction Co. (H.E. Hearn or J.L. Lang, Jr.). The necessary signature cards and corporate resolutions to set forth such persons will be forwarded as soon as possible.
 
 
 11
 As part of the agreement between Fenwick Associates, Inc., and Arthur Pew Construction Co., Fenwick Associates, Inc., has agreed not to change the signature cards and the corporate authorization other than the one to be submitted authorizing Thomas A. Fuller and a representative from Arthur Pew Construction Co. to sign checks on the subject account.
 
 
 12
 This letter was directed to Robert L. Derrick, FNBA's commercial lending officer who supervised the Buckhead account. According to Hearn, Derrick represented that the bank would honor the agreement set forth in the letter. Thereafter, Hearn warned Derrick that Fenwick might attempt to cancel the assignment of Sec. 8(a) proceeds and place Pew's interests in jeopardy. According to Hearn, Derrick expressly stated that FNBA would not release the assignments.
 
 
 13
 Approximately one week later, FNBA officials in Augusta informed Lipscomb that FNBA would no longer service Fenwick's accounts, including the Buckhead account. This information was not communicated to Pew officials. On September 21, 1983, Claiborne presented Donald R. Metz, a manager of a FNBA branch in Augusta, with a release of the assignments of the Buckhead account. According to Metz, Claiborne informed Metz that a release of assignments was necessary to stop automatic deposits to the Buckhead account. Since "Fenwick Associates, Inc." was the only named owner of the account, only Lipscomb's signature was necessary for the bank to execute the release. Metz did not contact Pew, Derrick or any FNBA officials in Atlanta before signing the releases. The record reflects that Metz was somewhat unfamiliar with the business arrangement between Pew and Fenwick and was unaware of the exact nature of the account.[1]
 
 
 14
 Pew officials learned of the release on September 26 or 27, 1983. By this time, Lipscomb had transferred over $300,000 from the Buckhead account and converted the funds for personal use. Fenwick filed a Chapter II bankruptcy proceeding in the Southern District of Georgia on October 13, 1983. Immediately upon learning that the Sec. 8(a) project proceeds had been misappropriated by Lipscomb, Claiborne withdrew from representation. The funds dissipated by Lipscomb proved to be neither traceable nor recoverable. Lipscomb was convicted in federal court of bankruptcy fraud and perjury.
 
 
 15
 On January 18, 1985, Pew filed a complaint in the United States District Court for the Northern District of Georgia against FNBA, Lipscomb, Claiborne and Cooney seeking damages under a variety of legal theories. FNBA cross-claimed against each of the other defendants. After discovery was completed, motions for summary judgment were filed by FNBA on January 13, 1986 and defendants Cooney and Claiborne on January 21, 1986. The district court granted these motions in an order filed April 4, 1986. Pursuant to Fed.R.Civ.P. 54(b), the order was amended on May 9, 1986 directing entry of judgment with respect to all claims except those against defendant Lipscomb which have not been adjudicated. After judgment was entered on May 12, 1986, Pew filed a notice of appeal.
 
 II.
 DISCUSSION
 A. Claims against FNBA
 Promissory Estoppel
 
 16
 Pew argues that the district court erred by ruling that the doctrine of promissory estoppel was unavailable under the facts. Ga.Code Ann. Sec. 13-3-44 (1982) provides in pertinent part:
 
 
 17
 A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.
 
 
 18
 The district court ruled that "Pew's promissory estoppel claim fails for the reason that the bank made no promises to Pew." Arthur Pew Construction Co. v. First National Bank of Atlanta, No. C85-141, slip op. at 10 (N.D.Ga. Apr. 4, 1986).
 
 
 19
 Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). After reviewing the record in the light most favorable to Pew, we conclude that FNBA has not sustained its burden of proving the absence of genuine issues of fact regarding the essential elements required to invoke the doctrine of promissory estoppel. The deposition testimony presents a substantial conflict regarding what assurances, if any, FNBA officials made to Pew that FNBA would maintain the assignments for the protection of Pew and notify Pew in the event that Fenwick attempted to secure their release. If FNBA officials did indeed promise to maintain the assignments, the record contains sufficient evidence from which a jury could reasonably conclude that FNBA breached the alleged promise to protect Pew's interests and that Pew reasonably relied upon the bank's assurances to Pew's detriment.[2] Accordingly, the portion of the district court's order granting summary judgment with respect to Pew's promissory estoppel claim is reversed.
 
 Negligence
 
 20
 Pew argues that the district court erred by ruling that a negligence theory was inapplicable under the facts. The district court analyzed the relationship between Pew and FNBA and found the absence of a legal duty predicating a negligence claim.
 
 
 21
 Under Georgia law, a legal duty is an essential element of a negligence action. See Galanti v. United States, 709 F.2d 706, 708 (11th Cir.1983), cert. denied, 465 U.S. 1024, 104 S.Ct. 1279, 79 L.Ed.2d 683 (1984). A duty may arise in professional relationships independent of a contract. See Flintkote Co. v. Dravo Corp., 678 F.2d 942, 949 (11th Cir.1982). As this court has acknowledged, "[o]ne who undertakes to perform a task must perform it in a non-negligent manner." Crockett v. Uniroyal, Inc., 772 F.2d 1524, 1531 (11th Cir.1985). Here, as indicated, when the record is examined in the light most favorable to Pew, a question of fact arises whether FNBA officials voluntarily assumed the task of maintaining the assignments for the protection of Pew and notifying Pew in the event that Fenwick officials attempted to secure a release. If such a duty in fact existed, the evidence in the record is sufficient from which a jury could reasonably conclude that FNBA's care fell below that required by law to protect Pew from unreasonable risk of harm. Accordingly, the portion of the district court's order granting summary judgment with respect to Pew's negligence claim is reversed.
 
 B. Claims against Cooney and Claiborne
 
 22
 Pew argues that the district court erred by ruling that there was insufficient evidence in the record to support Pew's breach of fiduciary, fraud and conversion claims brought against Cooney and Claiborne. We disagree and affirm the portion of the district court's order granting summary judgment in favor of these defendants.
 
 
 23
 At the time of the release of assignments, the relationship between Pew and Fenwick had deteriorated to the point that the parties were undeniably adversarial. Generally, an attorney owes no duty to the adversary of a client except to refrain from tortious conduct. Cf. Guillebeau v. Jenkins, 182 Ga.App. 225, 355 S.E.2d 453, 458 (1987) (under Georgia law an attorney may be sued by an adversary for fraud); Allied Financial Services, Inc. v. Easley, 676 F.2d 422, 423 (10th Cir.1982) (an attorney owes a duty to his adversary not to engage in fraudulent or malicious conduct). When analyzing a motion for summary judgment, the moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). We must affirm the granting of summary judgment if on any part of the prima facie case there is insufficient evidence to require submission of the case to a jury. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 609 (11th Cir.1987). Here, the record does not support Pew's contention that while acting on behalf of Lipscomb, Claiborne or his employer made any false representations or knowingly participated in any fraudulent or otherwise tortious conduct.
 
 
 24
 AFFIRMED in part, REVERSED in part and REMANDED.
 
 
 
 [1]
 Metz assumed that the assignments in question were assignments of convenience rather than contractual assignments
 
 
 [2]
 Had Pew been informed that Fenwick was attempting to obtain a release of the assignments, Pew officials could have initiated proceedings to obtain a Temporary Restraining Order and prevent the disbursement of funds from the Buckhead account pending resolution of the dispute over ownership of the Sec. 8(a) project proceeds. Since Pew was not notified of the release of the assignments until after Lipscomb had already absconded with the money, a Temporary Restraining Order issued by the Superior Court of Richmond County on September 30, 1983 proved to be of no service to Pew