ARTHUR PEW CONSTRUCTION COMPANY, INC., Plaintiff–Appellant,

v.

Lurton E. LIPSCOMB, Defendant,

First National Bank of Atlanta, Defendant–Appellee,

William L. Cooney, L. Patrick Claiborne, Defendants.

No. 90–8008.

United States Court of Appeals, Eleventh Circuit.

July 15, 1992.

William Cyrus Lanham, Clark H. McGehee, Lanham & McGehee, Atlanta, Ga., for plaintiff-appellant.

Beverly B. Bates, Bates, Baum & Landey, Atlanta, Ga., for defendant-appellee.

Before TJOFLAT, Chief Judge, KRAVITCH, Circuit Judge, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

Arthur Pew Construction Company, Inc. filed this action against the First National Bank of Atlanta (FNBA) and others, asserting liability under several legal theories.[1] The district court granted summary judgment to all defendants. On appeal we reversed the summary judgment in favor of FNBA and remanded with respect to two claims against FNBA for promissory estoppel and negligence. *See Arthur Pew Constr. Co. v. First Nat. Bank*, 827 F.2d 1488 (11th Cir.1987) (per curiam) (*Pew I*). After a trial the jury returned a verdict in favor of Pew on the negligence claim and in favor of FNBA on the promissory estoppel claim. FNBA then moved for judgment n.o.v. pursuant to Fed.R.Civ.P. 50(b). The district court granted the motion and entered judgment for FNBA on all claims. Pew then filed a motion for new trial under Rule 50(c)(2).[2] This was denied and Pew

---

**1.** Pew sued as debtor-in-possession under Chapter 11 of the Bankruptcy Code; federal jurisdiction, therefore, is predicated on 28 U.S.C. § 1334(b) (1988). Georgia substantive law provides the rules of decision for all of Pew's claims.

**2.** Fed.R.Civ.P. 50(c)(2) permits a party whose verdict is set aside on a motion for judgment

appealed. We reverse the judgment for FNBA and direct that the verdict for Pew be reinstated, with the exception of the damage award for interest at prime rate.

The order granting judgment n.o.v. adopted arguments made by FNBA and entered these findings and conclusions: (1) The evidence, and the jury verdict for FNBA on the promissory estoppel claim, "negatived" the existence of any duty owed by the bank to Pew.[3] (2) "Probably" the jury returned a verdict for Pew on the negligence claim because it was not called on to determine separately the existence of a duty as an element of that claim. (3) In returning a verdict for the bank on the promissory estoppel claim the jury "appeared" to have agreed with the bank that if the bank made a commitment to Pew (out of which a duty could arise) the results of its violating that commitment were not foreseeable. (4) If a commitment was made it was "likely" that the jury determined that it was not reasonable for the plaintiff to rely on it. (5) The damages awarded for negligence were only remotely related to the alleged negligence. (6) Pew's evidence of lost profits was speculative.

To review the order granting judgment n.o.v. we must examine the evidence of duty owed by the bank to Pew and of foreseeability and of reliance. The court's examination of the evidence went beyond what would have been a usual inquiry into sufficiency, i.e., whether the evidence was sufficient to submit to the jury on the issue of duty. See Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969). Instead, the court went much further and held that the evidence "negatived" the existence of a duty, which we take to mean that the evidence affirmatively established that there was no duty. We have examined the evidence in the light most favorable to Pew, as set out below. It clearly reveals that the court erred in

finding that the evidence "negatived" the existence of a duty. Having reached that conclusion, we move to the traditional issue of sufficiency—though the court did not address the matter in that form—and hold that the evidence that tended to show a duty was sufficient to submit that issue to the jury. Also, the evidence of foreseeability and reliance was sufficient.

Having examined the evidence and found it sufficient, we turn to the holdings of the court drawn from the jury verdict in favor of the bank on the promissory estoppel claim. We hold that these holdings too were erroneous.

Finally, on the damages issues, we hold that the court erred in finding Pew's damages for lost profits, legal fees to recover lost funds, travel and telephone expenses to recover lost funds, and payments made on surety bonds remote and speculative. The court did not err in finding that the damages for interest were too remote.

Thus, Pew is entitled to have its jury verdict reinstated, with the exception of the award for interest.

## I. The evidence

This case revolves around a business arrangement between Pew and Fenwick Associates, Inc. The Small Business Administration, through its § 8(a) program, enters into contracts with federal agencies and subcontracts the performance of these federal contracts to "socially and economically disadvantaged small business concerns." Pub.L.No. 95–507, § 202, 92 Stat. 1757, 1761 (1978) (codified as amended at 15 U.S.C. § 637(a) (1988)).[4] The SBA had determined that Fenwick, a minority-owned general contractor, was a socially and economically disadvantaged small business concern; accordingly, under the § 8(a) program, Fenwick secured several federal con-

---

n.o.v. to move for a new trial within ten days of entry of the new judgment.

**3.** The court held, and we agree, that Pew I did not hold that as a matter of law a duty was owed by the bank to Pew. Rather we noted that this was a question of fact. 827 F.2d at 1492.

**4.** To participate in the § 8(a) program, a "socially and economically disadvantaged small business concern" must be 51% owned by "one or more socially or economically disadvantaged individuals." Pub.L. No. 95–507, § 202(a)(4)(A), 92 Stat. at 1762 (codified as amended at 15 U.S.C. § 637(a)(4)(A) and 13 C.F.R. § 124.1–1(c)(2)(i) (1982)).

tracts. Fenwick mismanaged these contracts and jeopardized its ability to fulfill its obligations.

In 1982 Fenwick, through Lurton Lipscomb its president and sole stockholder, entered into an agreement with Pew, a general contractor that was not a socially and economically disadvantaged small business concern. The agreement was made in an emergency. Fenwick was about to lose several contracts within days because it had neither employees nor funds to begin work. Pew agreed to provide working capital and performance and payment bonds for Fenwick's projects, to advance Fenwick the funds it needed to bring its accounts payable current, and to manage the construction projects. All proceeds from jobs were to be deposited in Fenwick's bank account, from which all project expenses would be paid. Fenwick was to remain in control of all projects and was to be the point of control with the government. All employees were to be on Fenwick's payroll, and all debts were to be incurred in the name of Fenwick. Pew was to receive its expenses plus 40% of the profits generated by the contracts.[5] The agreement also provided that Pew would receive interest at the prime rate on advances made to Fenwick.

Payment and performance bonds on the Fenwick projects were made in Pew's name and paid for by Pew. These bonds made Pew responsible for completing the projects even though the contracts were let to Fenwick. Hearn, president of Pew, explained at trial that Pew was obligated to the surety on these bonds for any losses the surety might sustain, a possible liability that ran into millions of dollars. This large exposure caused Pew to "hang on" with Fenwick and attempt to get the Fenwick jobs completed despite misrepresentations and improprieties committed by Lipscomb and discussed below.

Pew had done business with FNBA for more than 30 years and had been a profitable and highly regarded customer. Pew asked FNBA to lend $75,000 to Fenwick. The bank declined, so Pew borrowed $75,000 from the bank and had it put in the Fenwick account. Subsequently Pew borrowed more from the bank and eventually advanced to the Fenwick account $300,000 borrowed from the bank. Pew secured this borrowing with its equipment, notes, and accounts receivable, including the income to be generated from the Fenwick projects.[6]

Under the arrangement between Fenwick and Pew, Fenwick would pick up from the disbursing officer checks for work on its jobs and would turn them over to Pew for disbursement. Soon, however, Lipscomb, in violation of the agreement, deposited into his own bank account some $90,000 of checks payable to Fenwick. Fenwick eventually disgorged $13,000; the balance never got to Pew for disbursement.

In their original negotiations Lipscomb told Hearn that Fenwick owed IRS some $50,000 for withholding and Social Security tax. Hearn worked with IRS to arrange monthly payments on this liability, to be paid out of funds from the Fenwick projects. IRS agreed to release tax liens on Fenwick's bank accounts. Fenwick had, however, misrepresented to Hearn the amounts that had to be paid, which exceeded $100,000. Lipscomb also concealed from Pew that previously, to secure a debt of some $80,000, Fenwick had assigned to a Tennessee bank the proceeds on one of the jobs included in the arrangements with Pew. Payments to this bank had to be made.

In February 1983, as a consequence of Lipscomb's diversion of the $90,000 of job proceeds, described above, Pew and Fenwick amended their agreement to eliminate the possibility of future diversions. They agreed that an account would be opened by

---

5. At trial Pew's president, Harold Hearn, testified that Fenwick and Pew picked this 40% figure (Fenwick was to receive the remaining 60% of the profits) because under the § 8(a) program, Fenwick was required to have 51% interest.

6. Pew's data submitted to the bank to secure loaned funds showed the income expected to come from the Fenwick jobs. Hearn, president of Pew, talked to the bank about this income.

Fenwick at the Buckhead (Atlanta) branch of FNBA, in which payments to Fenwick would be deposited and from which funds could be disbursed only on joint signatures of a Fenwick representative and a Pew representative. Hearn obtained from the government its form for assignment of contract proceeds, a simple one-page document that stated assignment was made pursuant to the Assignment of Claims Act. Fenwick and a bank officer signed one of these forms for each Fenwick contract, stating that Fenwick assigned to FNBA all of its right, title and interest in the particular contract and all funds due or to become due under the contract. Each form directed the Corps of Engineers to make all payments due under the contract directly to the bank. Fenwick could not have continued in business without Pew's help, and Pew would not continue to work with Fenwick without the assignments.

The bank sent each assignment document to the disbursing officer of the Corps of Engineers, accompanied by a letter from the bank giving notice of assignment. Each letter said:

This contract is assigned to The First National Bank of Atlanta, Buckhead branch, 3040 Peachtree Road NW, Atlanta, Georgia, 30305, account # 14 389 368.

The numbered account was the Fenwick account. Each letter also named a person who was authorized to personally pick up checks when due "to expedite deposit into this account." The Corps of Engineers sent each assignment and the accompanying letter notice to the contracting officer, the disbursing officer, and the surety on the job. The bank retained copies of the assignments in its files.

Thereafter checks were sent to the bank (or picked up) and deposited by the bank into the Fenwick account bearing the number shown in the notice. Fenwick did not have access to the preprinted checks for the account. FNBA had in its files a copy of the full Pew–Fenwick agreement.

On September 6, 1983 Lipscomb set out to again divert funds from the projects that were the subject of the arrangements with Pew. He and his attorney, J. Patrick Claiborne, an Augusta, Georgia lawyer, went to the FNBA branch in Augusta. Lipscomb opened a new account in that branch. He told the manager, Don Metz, that he wished to transfer the Fenwick account from the Buckhead branch to the Augusta branch. He could, however, draw on the Buckhead account only with joint Pew and Fenwick signatures. He attempted to surmount this by submitting to Metz a new signature card for the Buckhead account, supported by a corporate resolution of Fenwick that authorized only Lipscomb as the designated signatory on the Buckhead account. Pursuant to this new card, which purported to give Lipscomb sole control of the Buckhead account, Lipscomb sought to strip that account of some $97,000, its balance as revealed on Metz's computer screen. He obtained a counter check at the Augusta branch, made the check out to cash, filled in the Atlanta account number, signed it, and deposited it in the newly opened Augusta account. Metz did not notify Pew officials or contact anyone at the Buckhead branch about whether it was appropriate under the circumstances to change control over the Buckhead account and make Lipscomb the sole signatory.

Lipscomb's scheme failed because, by the time the $97,000 check reached Buckhead, other checks drawn on the account had been paid and the account balance was less than $97,000. The check was returned for insufficient funds. Pew learned what was happening because payroll checks properly drawn on the Buckhead account also were returned for insufficient funds. The bank froze the Buckhead account while its legal department determined which checks to honor and which to return for insufficient funds. By September 9 Metz had spoken with Robert R. Derrick, the commercial loan officer at Buckhead who supervised the Pew account, concerning the problems with the Buckhead account. Metz testified that by September 12 he knew of Pew's interest in the Buckhead account and of controversy between Pew and Fenwick concerning Lipscomb's wrongful diversion of contract proceeds.

On September 13, 1983 Hearn and Pew's counsel, Steven J. Martin, met with Lipscomb and Fenwick's counsel in an acrimonious meeting intended to get the Buckhead account "unfrozen." Lipscomb and Hearn executed a joint letter to Derrick at Buckhead that stated in part:

All checks on or after September 13, 1983, must have two signatures, one of Thomas A. Fuller [an independent public accountant], and one representative of Arthur Pew Construction Company.... The necessary signature cards and corporate resolutions to set forth such persons will be forwarded as soon as possible. As part of the agreement between Fenwick Associates, Inc. and Arthur Pew Construction Company, Fenwick Associates, Inc., has agreed not to change the signature cards and the corporate authorization other than the one to be submitted authorizing Thomas A. Fuller and a representative from Arthur Pew Construction Company to sign checks on the subject account.

The legal department of the bank had requested such a letter signed by Pew and Fenwick before it would "unfreeze" the Buckhead account. (Tr. 285–86.)

The parties at the meeting agreed that the account would remain in Fenwick's name but Fenwick would have no access to it. Pew would have complete control. Before the meeting concluded, Derrick was telephoned at the Buckhead branch. The ensuing conversation was put on a conference call so that all in the meeting could hear what was said. The letter was read to Derrick. He agreed that, based on the letter, the Buckhead account would be "unfrozen." According to the testimony of Hearn, during the meeting Fenwick's counsel had made a point of saying that Fenwick could unilaterally release the assignments any time Lipscomb chose. Hearn testified that, as a consequence, in the telephone conversation he explained to Derrick that he was afraid Lipscomb would try to have the assignments released and then abscond with the contract proceeds:

I said, "Robert, during the discussion in getting this resolved, they [Fenwick representatives] brought up repeatedly that they can get these assignments cancelled and I think you need to contact somebody in Augusta and be sure that this is not done, because I don't trust them." And they could hear what I was saying. Like I say, at this point, there were no punches pulled. Fenwick and Lurton Lipscomb and this attorney could hear this and I said it to Derrick.

(Tr. pp. 104–05.) According to Hearn, Derrick responded:

He said, "Don't worry about that." He said, "I'm not going to release them and nobody at First Atlanta Bank [FNBA] is going to release those assignments."

\* \* \* \* \* \*

He said, "I'm not going to release them for two reasons." He said, "Arthur Pew would be put in jeopardy, and also the bank's depending on that money for you to repay the note [sums borrowed by Pew]."

(Tr. p. 105.)

Attorney Martin testified, verifying the conversation between Hearn and Derrick, which he had overheard. Martin stated that he was satisfied that the mechanism of the assignments in place would adequately protect Pew.

Hearn hand-carried to the Buckhead office the joint letter that had been signed at the meeting and left it with Derrick's secretary. The next day he telephoned Derrick to make certain he had received the letter. Hearn described the conversation:

A. I called him the next morning and said, "Robert, I brought the letter up to the bank." He said, "Yeah, I have got it and everything is fine, that I have got it." And once again I said, "Robert, they were adamant about getting those assignments released and I really feel like you need to alert the people in Augusta."

\* \* \* \* \* \*

Q. What was his response when you mentioned once again that maybe he should contact somebody in Augusta?

A. He said the same thing he had the day before. I think he said, "Hearn, you're upset and uptight." And he

didn't say that, but that was the feeling I got, and he said, "Nobody is going to release these." And I said, "Well, Robert, you know, this is our lifeblood and I just feel like you ought to call." He assured me there was no problem. (Tr. 107.) Hearn testified that after this conversation with Derrick he felt secure that the contract proceeds would be protected.

Derrick testified that he could not specifically recall what he told Hearn about releasing the assignments, but he did not believe he would have given an assurance such as Hearn described. He never sent a copy of the September 13 letter to Metz. Metz testified that he "guess[ed] in the rush of business and in that branch, it was a matter he [Derrick] hadn't communicated to me." And, although Derrick and Metz discussed the Fenwick account over the next couple of weeks and, according to Metz, discussed the need to close Fenwick's accounts, Derrick never told Metz of Pew's concerns regarding the assignments, or of Fenwick's promise not to change the signature cards, or of any commitment to Hearn to give notice to Pew before releasing the assignments.

The signature card mentioned in the September 13 letter to Derrick, giving joint signatory authority to Pew and an accountant, was received at the Buckhead branch by September 21.[7] Meanwhile, Metz had determined unilaterally that the Fenwick account at Buckhead was a "problem account" that should be closed. He contacted Lipscomb on September 19 and informed him that the bank wanted all of Fenwick's accounts closed.

Metz talked with Derrick about the bounced [$97,000] check, the difficulties between Fenwick and Pew, and the fact that he [Metz] had frozen the account. They discussed the relationship of Pew to the bank, and the bank's desire to retain its collateral position on its loans to Pew. The assignments were not mentioned. Derrick

told Metz that Pew was an "interested party" in the Fenwick account and that there had been problems between Fenwick and Pew. Metz was told that representatives of Pew were joint signatories on the Fenwick account. Derrick told Metz that the bank didn't want to service the Fenwick accounts any more except the [Buckhead] account on which Fenwick and Pew were joint signatories "which we wanted to handle because the proceeds from the [Fenwick] contract work were boosting Pew's cash flow."

Fenwick's attorney, Claiborne, called Metz and complained of Fenwick's accounts being frozen. He told Metz the accounts couldn't be closed out with deposits coming in from jobs, and he asked Metz if he would release the assignments. Metz assented.

On September 21 Lipscomb and Claiborne visited the Augusta branch with a set of releases of assignment for all projects subject to the Pew–Fenwick arrangements. Metz testified that he had never seen releases like these and was unaware of what their ramifications would be. The documents stated on their faces, and Metz recognized, that they concerned contract proceeds destined for the Buckhead account. It was obvious by reading them that they had nothing to do with Fenwick's Augusta account. Metz knew that Lipscomb had unsuccessfully attempted to obtain all funds in the Buckhead account by the transactions of September 6. At trial he described Lipscomb's dealings with the bank this way: "We'd been dealing with this fellow over a year. He pulled all sort of shenanigans." Despite all this knowledge Metz executed the releases after reading one and skimming the others, without contacting Derrick, the bank's legal department, or any other bank official. Metz testified that he thought the assignments were merely for convenience and did not realize that they were actually assignments of contracts. Metz considered re-

7. There is some dispute about when the signature card arrived at FNBA's Buckhead office. The date typed on the card is September 20, 1983, and Pew contends that the card arrived at FNBA on this date. FNBA, however, stamped the card on September 21, 1983, indicating that it received the card on that date, and the lending officer testified at trial that FNBA received the card on that date.

lease of the assignments a necessary incident to closing out the Buckhead account, which he intended to do (i.e., the release would shut off the flow of funds into the account). Yet he had been told by Derrick that the bank wanted to keep that account open. Moreover, Metz testified that it was unusual for one branch [Augusta] to close an account of another branch [Buckhead] without contacting that branch, in fact this was the only time he had ever done so. Derrick described as standard operating procedure that if a person at one branch proposed to take action that would affect an account at another branch, there should be communication between the branches before the action was taken (Tr. 363). Derrick testified that Metz should have checked with him before the assignments were released (Tr. 364).

With respect to power to release the assignments, Derrick considered that Fenwick could not by itself release them (Tr. 354), but this is what Metz assented to and carried out.

Lipscomb gave the releases to another of his attorneys, who presented them to the government contracting officers and picked up checks. In the course of three days Lipscomb collected checks amounting to more than $300,000.

Pew learned a few days later that the assignments had been canceled, when a Pew employee attempted to pick up a check from a federal contracting officer for one of the projects and was informed that someone from Fenwick had already obtained the check. On September 26 or 27 Hearn called Derrick, advised him that the assignments had been released, and sought to determine how this had been accomplished. Hearn testified that Derrick replied:

> And Derrick said, "Hal, nobody at First Atlanta has released those assignments. I'll assure you that nobody at First Atlanta has released those assignments."

\* \* \* \* \* \*

He was totally shocked. He said, "There is no way anybody at First Atlanta released those assignments."

(Tr. 114–15.) Hearn found out from the disbursing officer that the assignments had been released by Metz in Augusta, and he passed this information on to Derrick. Derrick responded:

> And Derrick said, "Well, I don't think Metz would release the assignments, but let me check into it."

(Tr. 115.) Derrick then called Metz in Augusta and found, to his surprise, that Metz had released the assignments.

According to Claiborne, after Pew had protested to FNBA, Metz telephoned him [Claiborne] around September 26 about the release of the assignments. Claiborne described the conversation: "[Metz] was upset with the situation. He was mad at me. He was mad because he didn't check it out. He was mad at the bankers in Atlanta for not telling him what was going on and suddenly felt he had sort of stumbled into a hornet's nest."

Thus, as a result of the release of the assignments, Lipscomb was able to intercept and convert to his own use more than $300,000 of government payments that otherwise would have been sent to FNBA and deposited in the Buckhead account.[8] These funds were supposed to be applied to project expenses such as materials and labor and to repay advances made by Pew, and if there were any profits, these were to be divided between Pew and Fenwick. Lipscomb gave some of the money to his wife, used some to buy himself a car, and squandered most of the remainder on personal expenses. On September 30 Pew obtained a temporary restraining order from the Superior Court of Richmond County, Georgia, prohibiting Lipscomb from receiving, collecting, or disbursing any of the funds of the government projects. Fenwick, on October 13, commenced a bankruptcy proceeding in the Southern District of Georgia. The bankruptcy trustee was

---

**8.** In *Pew I,* we incorrectly stated that Lipscomb transferred funds from the Buckhead account. 827 F.2d at 1491. Evidence at trial showed that

Lipscomb diverted the funds before they reached the Buckhead account.

able to recover only a small portion of the funds that Lipscomb had purloined. Of the more than $300,000 Lipscomb diverted approximately $180,000 was accounted for or traced; the trustee was unable to find or account for the balance of $120,000. Subsequently Lipscomb was convicted in federal court for bankruptcy fraud and perjury.

Pew received none of the funds wrongfully diverted by Lipscomb. The remaining contract proceeds were paid by the Corps of Engineers to Fenwick's trustee in bankruptcy. Pew was required, however, under the terms of its performance bonds, to complete the projects at its own expense. Ultimately Pew's bonding company had to step in and complete the projects. Pew was required to reimburse the bonding company. Also Pew paid the bank in full on its loans. Pew subsequently lost its bonding capacity, without which it was unable to bid for new contracts. In October 1983 Pew filed for Chapter 11 bankruptcy protection.

In December 1983 Claiborne withdrew from representation of Fenwick, which he stated occurred because of untruthful representations made to him by Lipscomb.

In January 1985 Pew brought this suit against FNBA, Lipscomb, Claiborne, and Claiborne's employer, seeking damages under a variety of legal theories. Counts two through five presented claims against FNBA: common law negligence, breach of contract, failure to exercise a degree of care and diligence required by law, and breach of fiduciary duty. All of the claims were based on Pew's theory that FNBA had a duty, contractual or otherwise, to notify Pew if there were any attempts to release the assignments and that FNBA had acted improperly in releasing the assignments without giving Pew notice.

FNBA denied liability and cross-claimed against the other defendants, seeking damages equal to the amount of any judgment obtained by Pew against FNBA. After the parties completed discovery, FNBA, Claiborne, and Claiborne's employer filed motions for summary judgment, which the

court granted. Thereafter the court entered final judgment for FNBA, Claiborne, and Claiborne's employer. Pew's claims against Lipscomb were still pending, so the district court entered a Rule 54(b) certification and Pew appealed.

We reversed the summary judgment on the two counts against FNBA that claimed promissory estoppel and negligence. *See Pew I*, 827 F.2d at 1488. We held: (1) that "[i]f FNBA officials did indeed promise to maintain the assignments [for the protection of Pew], the record contains sufficient evidence from which a jury could reasonably conclude that FNBA breached the alleged promise to protect Pew's interest and that Pew reasonably relied upon the bank's assurances to Pew's detriment," *id.* at 1492; and (2) that if "FNBA officials voluntarily assumed the [duty] of maintaining the assignments for the protection of Pew and notifying Pew in the event that Fenwick officials attempted to secure a release.... [then the] evidence in the record is sufficient from which a jury could reasonably conclude that FNBA's care fell below that required by law to protect Pew from unreasonable risk of harm." *Id.* We remanded these counts to the district court for trial.[9]

At trial the court instructed the jury that if it were to return a verdict for Pew on both the promissory estoppel claim and the negligence claim, Pew would have to elect which damages award to collect; it could not collect on both. The jury returned a verdict in favor of FNBA on the promissory estoppel claim and in favor of Pew on the negligence claim and awarded Pew in excess of $400,000.

FNBA filed a timely motion for judgment n.o.v. It raised sufficiency of the evidence, foreseeability, proximate cause and remote and speculative damages. Specifically, FNBA asserted that by its verdict for defendant on the promissory estoppel claim the jury had "rejected any contention that the bank officials promised to notify Pew in the event Fenwick officials attempted to secure a release."

---

9. We affirmed the summary judgment on the other claims against FNBA and on the claims against Claiborne and Claiborne's employer. *See Pew I*, 827 F.2d at 1492–93.

## II. Negligence; the promissory estoppel verdict

The district court found that the existence of a duty from the bank to Pew was "negatived" by the evidence and by the verdict of the jury on the promissory estoppel claim.

First, with respect to the evidence. We have described the evidence that, viewed in the light most favorable to Pew, permitted the jury to find that the bank undertook a duty. Even if there had been a conflict in the evidence of whether Derrick made (and reiterated) promises to Hearn and his lawyer, the jury would have been entitled to accept the testimony of Hearn and attorney Martin. But there was no conflict. Derrick did not deny making the promises that Hearn and Martin described. Derrick testified only that he could not specifically recall what he said but that he did not believe he would have given such assurances. The permissible inference that the bank did undertake a duty to keep the assignments in effect is corroborated by Derrick's statements and actions after he learned, to his surprise, that the assignments had been released by Metz. It is supported further by Derrick's view that Fenwick could not by itself release the assignments.

Turning to the jury's verdict in favor of the bank on the promissory estoppel count, the judge gave a multiple effect to it. First, she held, "[p]robably, the jury returned a verdict for the Plaintiff on the negligence claim because it was not called upon to separately determine the existence

of [a] duty as an element of that cause of action."

The court had instructed the jury on negligence as follows:

All right, now I am going to turn to the plaintiff's negligence claim, and this claim is also premised on Pew's claim that the bank had undertaken to notify Pew before releasing the assignments in question. In order to recover on a negligence claim, the plaintiff must prove by a preponderance of the evidence each of the following: first, that the defendant was negligent; secondly, that such negligence was the proximate or legal cause of the damage sustained by the plaintiff; third, that the damage to the plaintiff was foreseeable to the defendant.

FNBA did not object to this instruction nor did it contend in its motion for judgment n.o.v. that the jury had not been properly charged.[10] It was, therefore, too late, on motion for judgment n.o.v., to speculate that the jury may not have understood that it was called on to determine the existence of a duty as an element of negligence when it had not been instructed to do so.[11]

The second effect given to the promissory estoppel verdict concerned reliance. The court held: "[B]y its verdict on the promissory estoppel count, the jury implicitly indicated its rejection of reasonable reliance on a promise, which would be essential to the finding of a legal duty [to support the negligence claim]," and "the jury likely determined that Pew's reliance on the bank not to allow the assignment to be released was not reasonable under the cir-

---

**10.** Under some circumstances the existence of a duty is a question of law for the court, i.e., where one sues the owner of premises for injuries caused by a third party and the proprietor has no reasonable grounds for apprehending the unforeseen and unexpected acts of the third party. *See Adler's Package Shop, Inc. v. Parker*, 190 Ga.App. 68, 378 S.E.2d 323 (1989). And, as a matter of law there is no duty of a construction lender to protect a borrower from construction defects, where it has not undertaken activities connected with the construction. *See First Federal Savings Bank v. Fretthold*, 195 Ga.App. 482, 394 S.E.2d 128 (1990). These are traditional decisions, in which the court rules as a matter of law that there is no duty where no evidence supports the existence of duty.

In this case the court made no finding that there was no duty; if it had done so the negligence issue would not have been submitted to the jury. For reasons set out in text, had the court made such a finding it would have been plainly erroneous.

**11.** Additionally Pew objected to the instruction on negligence on the ground that, although the court had stated that the basis of Pew's claim was that the bank undertook to notify Pew prior to releasing the assignments, further explanation of this doctrine should be provided, and the court overruled Pew's objection.

cumstances." These surmises of what the jury might have had in mind were not supported by the evidence. The evidence that we have described was substantially undisputed that Pew did rely upon the assignments continuing in effect. Indeed, the assignment arrangement had been set up to protect Pew and the creditors on Fenwick jobs to whom Pew was disbursing. Hearn described Pew's reliance and testified that without the assurances from the bank that the assignments would remain in place Pew would not have continued to deal with Fenwick. Martin, Pew's lawyer, testified that, in the conversation originating from the September 13 meeting, Derrick was told that the assignments must "stay in place," to which Derrick responded:

> Don't worry about that.... Look, we froze the bank account, guys. Don't worry, we are not going to let these assignments out the back door.

(Tr. 402.)

Hearn described his efforts to get Buckhead to warn the Augusta branch about a possible effort by Lipscomb to release the assignments. There was no reason for these requests, or for a warning, if Pew was not relying on the assignments.

Moreover, it would be anomalous to conclude that the evidence was not sufficient to support an inference that Pew relied upon promises to keep the assignments in effect when the bank itself acknowledged that it relied on the assignments to protect it in its role as creditor of Pew. Hearn testified that he told FNBA the assignments protected not only Pew but Pew's ability to pay its loan to FNBA as well (Tr. 91). The bank repeatedly asked Hearn for accounting on its own jobs and the Fenwick jobs to show what Pew's cash flow was from each source (Tr. 205). The bank acknowledged that its loans to Pew were secured by all of Pew's accounts receivable, including funds coming to Pew out of the Fenwick jobs (Tr. 340–41). Derrick wanted to keep the Buckhead account open because the Fenwick funds would boost Pew's cash flow. Attorney Martin related that Derrick assured him and Hearn that "obviously" the bank was not going to

release the assignments, because it had made loans to Pew (Tr. 399).

There is no substantial evidence tending to show that Pew did not rely, or that its reliance was unreasonable.

■ The court's holdings on reliance seem to imply that the negligence and promissory estoppel verdicts had to be consistent, and that the negligence verdict failed because they were not. Fed.R.Civ.P. 49 requires that general verdicts with special interrogatories be consistent. These verdicts do not, however, involve interrogatories. No authority is suggested to us that requires that general verdicts be harmonious, especially in a situation such as this where the jury has been instructed that the plaintiff would have to elect between verdicts.

■ The court also held that Pew's damages were not proximately caused by the release of the assignments, stating,

> It appears that the jury agreed with the bank's argument that if any commitment was made by [FNBA's] officials, it did not extend to the unforeseen occurrence of the release of the assignments by the Augusta bank official who was not fully informed of events in Atlanta.

But, under the evidence, possible release of the assignments by the Augusta branch were not unforeseen. Derrick was twice asked to warn Augusta of this possibility, and he did not. Moreover, the undertaking of the bank to Pew was an undertaking of the bank, not of a single branch. Also, a bank witness acknowledged that Metz should not have acted without checking with Atlanta, and that his failure violated standard operating procedure. Metz was irate that Atlanta had failed to warn him of what it knew.

FNBA asserts that if it did breach a duty that it owed Pew, because of Lipscomb's intervening criminal act the breach was not the proximate cause of any damages suffered by Pew. If the criminal act is foreseeable the defendant may be liable. *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 296 S.E.2d 693, 696 (1982); *see also Sutter v. Hutchings*, 254 Ga. 194, 327

S.E.2d 716, 719 (1985). This is a paradigm case of a foreseeable intervening wrongful act. Lipscomb's wrongful diversion of contract proceeds was exactly the risk Pew sought to prevent by having the assignments in place, and the bank knew this.

## III. Damages

The jury awarded Pew the following damages:

| | |
|---|---|
| Legal fees from September 27, 1983 through June 30, 1985 seeking to recover lost funds: | $ 22,400 |
| Payments due Fireman's Fund under bond including legal fees, for expenses incurred in completion of projects: | $ 45,600 |
| Additional telephone and travel expenses incurred in effort to recapture stolen funds and salvage projects: | $ 1,000 |
| Pew's share of profits on projects at issue: | $222,305 |
| Interest (9/21/83 through 11/15/88 at prime rate): | $156,903 |
| TOTAL | $448,208 |

■■■ The court held that the evidence on lost profits was speculative because Pew had relied on projections rather than actual data about "expenses incurred on the projects prior to the release of the assignments in order to compute expected profits had the projects been finished." The district court found that the other damages were only remotely related to the bank's allegedly negligent act of releasing the assignments.[12]

The damages were, however, what Pew sought to prevent by the assignment mechanism. FNBA knew that Pew was depending on the contract proceeds to pay job expenses and ultimately generate a profit. The bank was aware of Hearn's fear of wrongful diversions, and it could foresee that legal help would be required to recover future wrongful diversions that might result from release of the assignments. Further, FNBA was intimately familiar with Pew's financial condition, and a jury could find that FNBA could reasonably anticipate that Pew might become liable to the surety if Pew's cash flow should be interrupted by another wrongful diversion by Lipscomb. We find that the damages for legal fees and additional travel and telephone expenses to recover the lost funds, lost profits for the Fenwick projects in progress, and payments to the bonding company were not too remote.

■■■ The district court also found Pew's evidence of damages concerning lost profits too speculative. Pew presented evidence on the profits it anticipated the projects would generate, based on estimated costs and the higher profit margin built into § 8(a) contracts. FNBA contends that Pew should have been required to present evidence of actual costs for the projects, since they were completed. Hearn testified that the actual costs of the project were, however, substantially higher than expected because of Lipscomb's wrongful diver-

---

12. In its motion for judgment n.o.v. the bank challenged only the damages for lost profits and interest. In its motion for directed verdict, however, the bank had challenged all elements of damages asserted by Pew. Although the bank did not raise the issue of remoteness as to the other three items of damages awarded by the jury, the district court ruled that all of the damages were too remote. Rule 50(b) states that "Whenever a motion for a directed verdict made at the close of all the evidence is denied ... the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." A motion for judgment n.o.v. is technically just a renewal of a motion for directed verdict. *House of Koscot Development Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64 (5th Cir.1972). Since the court is deemed to have reserved a ruling on the legal questions raised by the motion for directed verdict, it could rule on those issues after the jury returned its verdict. We, therefore, address the court's ruling as to all elements of damages.

sion of contract proceeds. The wrongful diversion, in turn, was the direct result of FNBA's release of the assignments. Hearn further testified that the projects suffered delays because of the interruption in Pew's cash flow, Fenwick's ensuing bankruptcy, and, finally, Pew's bankruptcy. The jury was not required—and it would make no sense for it to be required—to decrease the award of damages to Pew for lost profits because the actual costs were higher than projected when the higher costs can be traced to FNBA's negligent release of the assignments.

█ Georgia law does not require a claimant to prove an exact dollar figure when seeking lost profits; it is sufficient if the facts provide a reasonable basis for computation. *McDermott v. Middle East Carpet Co., Assoc.,* 811 F.2d 1422, 1427 (11th Cir.1987). Pew provided documentation that was submitted to the bank to obtain loans on the projects and testimony about the higher profit margin that is built into § 8(a) contracts. The jury also heard expert testimony on the economic climate of the construction industry at the time of these events, which argued well for Pew's economic recovery. The record contains sufficient facts from which the jury could ascertain the profits lost by Pew because of FNBA's negligence.[13]

█ The district court's finding that the damages were too remote swept in the award of interest along with everything else. On this one item of damages we agree with the district court. Pew does not dispute that the sole basis for the award of interest is a provision in the agreement between Pew and Fenwick which states, in part:

All funds advanced by Pew to this date and during the term of this contract will draw interest at the current prime rate of The First National Bank of Atlanta if not repaid within sixty (60) days. No retroactive interest is to be charged and repayment of advances shall be made as rapidly as possible to hold down interest expense. Repayment will be applied to the oldest outstanding balance and interest will be billed monthly beginning March 1 to March 31, 1983.

Pew asserts that it did not receive the interest payments because the bank wrongfully released the assignments which led to Lipscomb wrongfully diverting the contract proceeds, which ultimately led to Pew not being paid the interest Lipscomb owed it under its contract. Pew contends that because FNBA had a copy of the Pew–Fenwick agreement on file the bank could reasonably foresee this chain of events, and that there is sufficient evidence to support this award. The only evidence, however, is that the bank had a copy of the Pew–Fenwick contract.[14]

---

13. Pew says that its "lost profits" are sustainable because the amount it testified to, $286,000, is less than the amount diverted by Lipscomb, $320,000. The bank responds that the amount diverted was never proved because Lipscomb paid some, although we do not know how much, for materials and labor on the Pew–Fenwick projects. Because we find that Pew's damages for lost profits are sustainable as lost profits, we need not address this argument.

14. Pew cites two statutes in support of its interest award.

O.C.G.A. § 7–4–15 states:
All liquidated demands, where by agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them; if payable on demand, they shall bear interest from the time of the demand. In the case of promissory notes payable on demand, the law presumes a demand instantly and gives interest from date.

O.C.G.A. § 13–6–13 states:
In all cases where an amount ascertained would be the damages at the time of the breach [of contract], it may be increased by the addition of legal interest from that time until the recovery.

Pew did not raise the applicability of these statutes at any time before this appeal. We note, however, that Pew has taken both statutes out of context.

Title 7 is the Financial Institutions Code of Georgia. O.C.G.A. § 7–1–1. Its objective is to regulate financial institutions in the interest of "the livelihood of the people of this state[,] ... the stability and growth of the economy and ... the public." § 7–1–2. Chapter 4 concerns interest that may be charged on loans and the specific section cited by Pew allows interest to be recovered in an action to enforce a contract. It has nothing to do with a tort action against a defendant not a party to a contract that provides for interest.

Georgia law does not permit recovery of damages if it is "only the imaginary or possible result of a tortious act or of other and contingent circumstances preponderate in causing the injury." O.C.G.A. § 51–12–8. The bank's mere possession of a copy of the contract, without more, is insufficient to support the jury's award of interest at prime rate.

## IV. Evidence of value as a going concern

 Pew filed a motion for a new trial contending, among other things, that the trial court erred in refusing to allow the jury to consider evidence that declaring bankruptcy had reduced Pew's value as a "going concern." The court denied Pew's motion. Georgia does not permit recovery for damages resulting from the destruction of a business as a "going concern." *Molly Pitcher Canning Co. v. Central of G.R. Co.,* 149 Ga.App. 5, 253 S.E.2d 392, 398 (1979). The court did not err in refusing to admit evidence or in denying a new trial on this issue.

## V. The theory that as a matter of law no duty could arise

As we understand Chief Judge Tjoflat, he contends that, even if the bank undertook to maintain the assignments in effect, as a matter of law no duty to Pew could arise that would support an action for negligence. His analysis appears to run this way: (1) The only assignments of federal contract proceeds permitted by federal statutes are assignments to banks, and there were no assignments from Fenwick to FNBA. (2) Fenwick and the bank violated federal law by representing to the government that there were assignments when there were not, and this false representation was part of a scheme in which Pew was a participant. (3) Because of this violation of law, even if FNBA undertook to keep the assignments in effect, no duty could arise that would support an action in negligence brought by Pew against the bank.

 In our view these issues are not properly addressed in this case, but, if they are to be considered, the court does not agree with Chief Judge Tjoflat's conclusions.

None of the matters in Chief Judge Tjoflat's analysis is before us. None was raised by the pleadings, by the request for or grant of summary judgment, or in the first appeal, or at the merits trial, or on motion for judgment n.o.v., or in briefs, argument and submission in this second appeal. Nearly nine months after oral argument and submission Chief Judge Tjoflat *ex mero motu* raised these matters for the first time and directed the parties to file supplemental briefs, which they did.

There are many reasons why the court cannot properly reach these issues.

(a) Untimeliness. The issues simply come too late.

(b) The issue of illegality was not raised by the bank. Fed.R.Civ.P. 8(c) requires that illegality be affirmatively pleaded. *John R. Lewis, Inc. v. Newman,* 446 F.2d 800 (5th Cir.1971). As we understand Chief Judge Tjoflat's position, illegality was not required to be pleaded because it was subsumed in the issue of duty, which was raised and litigated. But duty was litigated as a fact issue, i.e., whether the bank undertook a duty. What is now raised is a new issue of law—whether Pew's participation in the arrangements for assignments barred an action for negligence. One cannot reach that issue without overleaping other questions of fact and law not previously raised or adjudicated: were there assignments to the bank and were they permitted by the assignment statutes, 31 U.S.C. § 3727 and 41 U.S.C. § 15; did the parties have the intent necessary to violate the false statement or scheme statute, 18 U.S.C. § 1001; was illegality (if any) a proximate cause of the harm to Pew; was illegality (if any) available to the bank as a defense to negligence and, if it could be a defense, should it be imposed by the court in this civil suit over

---

Title 13 applies only to contracts. Chapter 6 sets forth the damages that may be recovered for breach of contract. Pew has not asserted that FNBA breached a contract.

the bank's contention that nothing illegal occurred?

(c) Consideration of these questions would violate the law of the case and, as a matter of judicial administration and of relationship between circuit and district courts, would be inappropriate. When the district court granted summary judgment it necessarily decided that there were no genuine issues of material fact and then, with respect to the negligence claim, held that as a matter of law the bank was entitled to judgment because there was no duty on which to base such a claim. In the first appeal this court held that there could be a duty because there was a genuine issue of fact of whether bank officials voluntarily assumed the tasks of maintaining the assignments for the protection of Pew and of notifying Pew in the event Fenwick officials attempted to secure a release. We held that if such a duty existed the evidence was sufficient from which a jury could reasonably conclude that the bank's care fell below that required by law to protect Pew from unreasonable risk of harm. *Arthur Pew Construction Co., Inc. v. First National Bank of Atlanta*, 827 F.2d 1488, 1492 (11th Cir.1987).

This court, in the first appeal, was aware that assignments had been executed and of the relations between the parties. If, as a matter of law, no duty could arise although the bank undertook a duty, the court would have affirmed the summary judgment for the bank because there would have been no reason for a remand. Also, the court's examination of the evidence and its conclusion that the evidence was sufficient to support a breach of duty would have been an exercise in futility. The reversal for a trial of the facts concerning assumption by the bank of a duty necessarily rejected the possibility that, even if the duty were found to have been assumed, as a matter of law the bank could not be liable.

Apart from the formal structure of law of the case, it would be highly inappropriate for this court, after reversing a summary judgment and ordering a trial, to hold in a second appeal after the trial (especially on its own motion and in opposition to the position of the parties) that the trial was unnecessary.

(d) Chasing the rabbit of illegality ignores our innumerable decisions that we will not consider issues not raised below and/or not raised on appeal, and—in this particular instance—not raised in a prior appeal and now eschewed by the parties.

 Assume, however, that we are to reach the issues raised by Chief Judge Tjoflat. There has been no violation of the assignment statutes. They permit assignments to a bank. Under the undisputed facts, the assignment to the bank was an assignment for collection. Pew, Fenwick, and the bank intended that the bank was named as assignee to collect Fenwick's money and deposit it in Fenwick's account. An assignment absolute in form can be shown to be for collection only. Corbin, *Contracts* § 882 at 543 and 546. *See U.S. v. Lester*, 235 F.Supp. 115 (S.D.N.Y.1964) (summary judgment denied because there was a triable issue of material fact whether the assignment in issue was absolute or for collection only). An assignee for collection will hold the proceeds in trust for the assignor. Corbin, *id.* at 545. In this case the bank was obligated to deposit the collected funds in Fenwick's account, and it did so. Neither the face of the assignment statutes nor their policy forbids assignment to a bank for collection.

 Assume additionally that the assignments were not permitted by the statutes, a jury could find that Pew and the bank did not have the intent necessary to violate the false statement statute, 18 U.S.C. § 1001,[15] by the execution and delivery of the assignment forms to the govern-

---

**15.** 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

ment. Violation of § 1001 requires proof of specific intent. The misrepresentation or scheme must have been deliberate, knowing and willful, or at least with a reckless disregard of the truth and a conscious purpose to avoid telling the truth. *U.S. v. Lange*, 528 F.2d 1280 (5th Cir.1976). It is at least a jury issue whether Pew, Fenwick, or the bank had the specific intent required. They were pursuing a valid objective. A mentor arrangement, such as existed here between Pew and Fenwick, is frequently utilized and indeed recommended to assist minority enterprises. No harm to the government was intended and none occurred. The funds were Fenwick's, they were to be deposited in Fenwick's account, and they were intended to be, and in fact were, disbursed to pay bills and expenses on Fenwick projects until Fenwick diverted funds. Neither the methodology of disbursement from the Fenwick account nor the agreement for division of any profits was shown at trial to violate any regulation or policy.

The mechanical application of the assignment statutes to create a shield for the bank in this case is out of keeping with the caselaw concerning application of the statutes.

> [I]t should be noted that although the language of the section is broad, many limitations have been engrafted upon it. It has never been applied blindly, but rather, in each case, the Court has looked to the *ratio legis* to see whether the assignment involved was 'within the mischief which Congress intended to prevent.' *Freedman's Savings & Trust Co. v. Shepherd*, 1888, 127 U.S. 494, 505, 8 S.Ct. 1250, 1255, 32 L.Ed. 163 [ (1888) ].

*Thompson v. Commissioner of Internal Revenue*, 205 F.2d 73, 75 (3d Cir.1953). The assignments to the bank did not deprive the government of the attention and services of Fenwick, nor was there a speculative acquisition of a contract by Fenwick followed by a sale to a non-successful bidder. *See Thompson*, 205 F.2d at 76. Under the commonsense approach described in *Thompson*, the statutes have been held not to apply in a host of situations. See list in *Thompson, id.* at 76. "[I]t is clear

that not every assignment comes within the prohibition of [the assignment statutes]." *Id.* at 77.

■■■ Moreover, despite the bar of 41 U.S.C. § 15 the government may if it chooses recognize assignment of a contract between itself and another. *Maffia v. U.S.*, 163 F.Supp. 859, 143 Ct.Cl. 198 (1958); *U.S. v. Russell Elec. Co.*, 250 F.Supp. 2 (S.D.N.Y.1965). The government recognized the assignments in this case and made payments to the bank until the assignments were released. It has not objected to the assignments or questioned them. The government may waive the prohibition of the assignment statutes. *Benjamin v. U.S.*, 318 F.2d 728, 730, 162 Ct.Cl. 47 (1963).

■■■ The assignment statutes are for the protection of the government. They do not regulate the rights of parties to an assignment. *United Pacific Ins. Co. v. U.S.*, 358 F.2d 966, 970, 175 Ct.Cl. 118 (1966). Whether or not an assignment is valid as against the United States, it is effective and binding on the parties. *Id.* "The legislation [41 U.S.C. § 15] was enacted for the benefit of the United States and if the United States recognized the assignment, the parties are not in a position to object." *United Pacific Ins. Co. v. Timber Access Industries Co.*, 277 F.Supp. 925 (D.Ore.1967). The statute is for the protection of the United States only, and it does not affect the rights of the parties to such a transfer. *Hegness v. Chilberg*, 224 F. 28, 33 (9th Cir.1915); *see also Tinker & Scott v. U.S.F. & G.*, 169 F. 211 (9th Cir.1909).

■■■ Additionally, there is an untried issue of proximate cause. A plaintiff may be barred where alleged negligence consists of the joint performance with the defendant of an act that is prohibited by statute. But where the acts are separate and distinct, even if contemporaneous and in violation of statute, the person injured is not barred from recovery unless his own negligence was the cause of the injury. Georgia points out:

> The theory upon which an injured party is debarred of a right to recover when

injured while engaged in the performance of an illegal or criminal act rests, not upon the ground that he is performing an illegal or criminal act, either alone or jointly with the defendant, but upon the ground that his conduct is negligent and is the proximate cause of his injury. Even though negligence might be shown as a matter of law, the question of proximate cause may still be one for the jury.

*Gaines v. Wolcott,* 119 Ga.App. 313, 167 S.E.2d 366, *aff'd,* 225 Ga. 373, 169 S.E.2d 165 (1969). For example, in Georgia, as in a majority of the states, a woman who consents to an illegal abortion may recover for the negligence of the person performing the abortion. *Id.* The proximate cause of the injury is the act of the performer. In this case, assuming that Pew's participation in the overall assignment arrangements were not permitted by the statutes and the participants had the intent necessary for a violation, there remains at least a jury issue whether Pew's participation was a proximate cause of Pew's injury. A jury might find that the sole proximate cause was the breach by the bank of its promises to keep the assignments in effect.

AFFIRMED in part, REVERSED in part, and REMANDED with instructions to reinstate the verdict for plaintiff except for the award of interest.

TJOFLAT, Chief Judge, dissenting:

Respectfully, I dissent. I would affirm the district court's judgment in favor of FNBA. As a matter of law, FNBA could not have owed Pew a duty to maintain the "assignments" at issue in this case since those "assignments" were conceived and executed as a means to defraud the federal government.

I.

Under Georgia law, "[o]ne who, by a gratuitous promise ... which he should realize will cause another reasonably to rely upon [him to] perform[, as the other's agent,] definite acts of service ... is subject to a duty to use care to perform such service or ... to give notice that he will not perform." *Mixon v. Dobbs Houses, Inc.,* 149 Ga.App. 481, 254 S.E.2d 864, 865–66 (1979) (quoting Restatement (Second) of Agency § 378 (1958)); *see also Simmerson v. Blanks,* 149 Ga.App. 478, 254 S.E.2d 716, 718 (1979). Pew, relying on this voluntary-agency principle, concludes that FNBA, through its promise or assurance to Pew, assumed a duty to protect Pew's interest in the "assignments" by not releasing them to Fenwick; Pew contends that FNBA's breach of this duty damaged it.

Pew ignores, however, that there were, in fact, no actual assignments to FNBA of the contract proceeds due Fenwick from the government.[1] Rather, Fenwick and

1. I recognize that 41 U.S.C. § 15 (1988) states: "Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this section, shall constitute a valid assignment for all purposes." I believe, however, that "assignment pursuant to this section" means an interest in moneys due under a federal contract taken by a financing institution in return for valuable consideration. In most cases, this will occur when the financing institution lends money to the party who has the contract with the government, and takes the assignment of money due that party as collateral. The legislative history to the Assignment of Claims Act supports this position. The Senate Report, for instance, stated that, under the law existing before Congress passed the Assignment of Claims Act,

> banks and other lending agencies which might otherwise be willing to extend credit to finance the performance of contracts with the Government are unable to rely upon assignments of amounts payable under such con-

tracts as security, because they [could not rely on assignments of the proceeds of these contracts as collateral].

. . . .

> If ... businesses [bidding on Government contracts] could offer security in the form of assignments of claims against the Government growing out of such contracts they would in many instances be able to obtain the necessary credit from their own local banks and other financing institutions....

S.Rep. No. 2136, 76th Cong., 3d Sess. (1940); *see also* H.Rep. No. 2925, 76th Cong., 3d Sess. (1940) (same); 86 Cong.Rec. 12,560 (1949) (statement of Rep. Wolcott) (Act intended to correct "prohibition in existing law against the pledging of Government contracts as security for loans by banks"); *General Casualty Co. v. Second Nat'l Bank,* 178 F.2d 679, 680 (5th Cir. 1949) (one purpose of Assignment of Claims Act "was to make it possible for contractors to pledge to a bank, as collateral security, their claims against the Government in order to en-

FNBA merely represented to the government that Fenwick had assigned these proceeds to FNBA. FNBA never acquired any interest in the funds in question. In a true assignment, however, FNBA would have acquired some right to these funds. *See Bank of Cave Spring v. Gold Kist, Inc.*, 173 Ga.App. 679, 327 S.E.2d 800, 802 (1985) ("An assignment is a contract and, in order to be valid, must possess the same requisites … as any other contract."). In effect, then, Pew asks us to hold that FNBA voluntarily assumed a duty to assist Pew in ensuring that Fenwick continued to represent to the government that it had assigned the funds at issue to FNBA— when no actual assignment had occurred— and that FNBA is liable for its breach of this duty. I believe we should decline to do so.

The evidence is overwhelming that Fenwick and FNBA misrepresented to the government the nature of their transaction in order to induce the government to depos-

it the funds in Fenwick's Buckhead account which the government believed belonged to FNBA. Shortly after Pew entered into an arrangement with Fenwick to manage and complete several of Fenwick's construction projects in exchange for a share of the profits generated, Lurton Lipscomb, Fenwick's president, wrongfully diverted some of the proceeds earned on the government contracts, which the government had paid directly to Fenwick, for his personal use. Pew, therefore, in order to protect its investment, needed to ensure that such diversions did not occur in the future. One way in which Pew might have been expected to protect itself would have been to seek to amend the government contracts to reflect Pew and Fenwick's joint venture arrangement[2] and, therefore, to become a joint payee on the checks. Pew did not do so, however. Steve Martin, Pew's attorney, testified that the Small Business Administration (SBA) would not permit Fenwick to enter into a joint venture;[3] Harold Hearn,

able them to borrow money to do the work required by the contract" (citing 86 Cong.Rec. 12,557 (1940))).

**2.** Although the agreement was headed "management contract," Pew admitted, in its briefs, that it and Fenwick were engaged in a joint venture.

**3.** The SBA regulations in force in 1982 and 1983, when Pew and Fenwick entered their agreement, did not explicitly preclude section 8(a) businesses, such as Fenwick, from entering into joint ventures. Moreover, the SBA's Standard Operating Procedure in force at this time specifically permitted participants in the section 8(a) program to enter joint ventures "with a nondisadvantaged concern, large or small, for the purpose of performing a specific [section] 8(a) contract." *Apex Constr. Co. v. United States*, 719 F.Supp. 1144, 1150 (D.Mass.1989) (emphasis deleted) (quoting Small Bus.Admin., Standard Operating Procedure 80 05, ¶ 49, a). Because I do not have a copy of this Standard Operating Procedure, I do not know what requirements the SBA imposed on the joint ventures it allowed. I think it probable, though, that, like the current SBA regulations that allow section 8(a) businesses to enter joint ventures only if the SBA approves them before the contract is awarded, *see* 13 C.F.R. § 124.321(d)(1) (1991), Fenwick and Pew, to enter a joint venture in 1982 and 1983, would have had to request SBA approval of their arrangement before the SBA awarded Fenwick the contracts. *Cf. Apex*, 719 F.Supp. at 1148 (parties "submitted a joint venture agreement to the SBA for approval"). Pew and Fenwick's arrangement may

have been problematic, then, because Fenwick had been awarded the contracts before it contracted with Pew.

In addition, I note that the SBA regulations in force in 1982 and 1983 only permitted section 8(a) businesses to be partnerships and corporations when one or more socially and economically disadvantaged individuals owned 51% of the company and controlled its management and daily operations. *See* 13 C.F.R. § 124.1–1(c)(2)(i)(A), (B), (ii) (1982). I assume, therefore, that even if Pew and Fenwick had submitted their joint venture to the SBA for approval before Fenwick was awarded the contracts, the SBA would have required them to show that Lipscomb would receive at least 51% of the profits of the joint venture and would control the management and daily operations of the contracts the joint venture performed. Martin's testimony indicated that Pew and Fenwick were concerned about the consequences if the SBA knew that Fenwick had entered a joint venture with Pew; for instance, Martin stated that Fenwick "would lose [its] minority status." This implies that Pew and Fenwick feared that the SBA would find that, under the agreement, Lipscomb no longer controlled Fenwick's management and daily operations with regard to the projects Pew was managing, and would, accordingly, terminate Fenwick's eligibility to participate in the section 8(a) program. *See id.* § 124.1–1(e)(ii), (vii), (xviii) (1982). In this respect, I note that the SBA's current regulations state that a nondisadvantaged business may be found to control a section 8(a) business when

Pew's president, testified that the government will make payments for its contracts only to the firm originally awarded the contract.

Another way in which Pew might have been expected to protect its interests would have been to require Fenwick to assign the proceeds from its government contracts to Pew as collateral for the amounts due to Pew under the agreement. Federal law, however, prohibits such an assignment. Under the Assignment of Claims Act of 1940, 31 U.S.C. § 3727 (1988) and 41 U.S.C. § 15 (1988), a party that contracts with the government may not transfer the contract or "any interest therein"; any such transfer causes "the annulment of the contract ... transferred, so far as the United States are concerned." 41 U.S.C. § 15. In addition, claims against the United States may be assigned only in limited circumstances, which did not exist in this case. 31 U.S.C. § 3727. Thus, as Hearn testified, if Fenwick had assigned the money due on its government contracts to Pew, the assignment "would not have been honored."

As Hearn indicated in his testimony, however, the Assignment of Claims Act provides an exception to the general prohibition against assignments of government contracts: a party that contracts with the government may assign money due or about to become due from a government contract to a bank or other financing institution, such as FNBA.[4] *See* 31 U.S.C. § 3727; 41 U.S.C. § 15. Accordingly, Pew

elected to ensure that Lipscomb would not divert any more funds to his personal use by amending its agreement with Fenwick; a new provision required all proceeds from Fenwick's government contracts to be "assigned" to FNBA, and stated that "funds received [by FNBA] w[ould] be deposited in a bank account in the name of Fenwick."

As required by this provision, Fenwick, with the assistance of FNBA, represented to the government—using government forms promulgated under the Assignment of Claims Act—that Fenwick had assigned the proceeds from its government contracts to FNBA. This obligated the government to send payment on Fenwick's contracts to the account specified by FNBA in the "instruments of assignment" it sent to the government, account number 14389368 at FNBA's Buckhead branch in Atlanta. This account, however, belonged to *Fenwick,* rather than FNBA; the documents Fenwick and FNBA sent to the government did not disclose this fact.[5] Thus, Fenwick did not actually assign its interest in the proceeds from its government contracts to FNBA: FNBA did not have, or acquire, any right to the proceeds from Fenwick's government contracts. FNBA did not, for instance, lend money to Fenwick and take an assignment of the proceeds as collateral. Rather, Fenwick retained its right to these funds—which were deposited in an account in its name—and owed a portion of them to Pew pursuant to their contractual arrangement.[6]

---

the nondisadvantaged business "has the power to control day-to-day direction of the business affairs of the [section 8(a) ] business" or when it "provides critical ... bonding support ... which directly or indirectly allows [it] to gain control or direction." *Id.* § 124.104(d)(2), (3) (1991).

4. Hearn stated that "the only assignment you can make of funds due on a government contract is to a financial institution."

5. These instruments of assignment informed the government that Fenwick had assigned the contracts to "The First National Bank of Atlanta, Buckhead Branch, [address], Account Number 143868"; they implied, therefore, that the account specified was FNBA's.

6. The parties, in supplemental memoranda filed at the court's request, argue that Fenwick did in fact assign the proceeds from its government

contracts to FNBA. They rely on Fenwick and FNBA's use of the correct governmental form to support their position. Their reliance, however, is misplaced; there simply is no evidence in the record demonstrating that Fenwick actually assigned the proceeds from its government contracts to FNBA. Nor is there evidence that FNBA encouraged Fenwick to execute the "assignments" to protect FNBA's interest in the loans to Pew. Although Hearn testified that the assignments existed to protect FNBA's interest in the loans to Pew, FNBA officials testified that the assignments were merely an accommodation to Pew, a long-time customer. Moreover, I find no evidence, in the portion of the record Pew cites, for Pew's contention that FNBA "required that the assignments be put in place before it would extend additional credit to Pew so that [Pew] could proceed with the[ ] projects."

This "assignment," which obligated the government to send the proceeds on Fenwick's contracts to Fenwick's Buckhead account, was in actuality a direct deposit arrangement: Fenwick opened the Buckhead account and arranged to have the proceeds from its government contracts directly deposited into it. This arrangement protected Pew because Pew and Fenwick controlled the account jointly; representatives of both companies were signatories on the account.

If Fenwick and FNBA knowingly misrepresented to the government the nature of their transaction to induce the government to deposit the funds in Fenwick's account—and there is no reason to suspect that these parties did not know the true nature of their arrangement—this would violate 18 U.S.C. § 1001 (1988).[7] To continue this scheme, as Pew suggests FNBA was obligated to do, would further violate federal law. *See id.* Thus, Pew's argument that FNBA owed it a duty, in tort, to ensure that the "assignments" were not released is, essentially, an argument that FNBA had a duty to continue to perform, or assist in the performance of, an illegal act. I do not believe that Georgia law would countenance such an argument. Contracts that require individuals to perform illegal acts are unenforceable under Georgia law. O.C.G.A. § 13-8-1 (1982). Similarly, although I have found no case on point, I do not believe that any Georgia court would allow a cause of action in tort based on a person's voluntary assumption of a duty to perform, or to aid in the performance of, an illegal act. *Cf. Hamm v. Auld,* 192 Ga. App. 717, 386 S.E.2d 385 (1989) (promise that was unenforceable—because illegal—when made cannot serve as the basis for a fraud action); O.C.G.A. § 51-1-6 (1982)

("When *the law requires* a person to perform an act for the benefit of another ... the injured party may recover for the breach of such legal duty if he suffers damage thereby.") (emphasis added); Prosser & Keeton on the Law of Torts 356 (W. Keeton 5th ed. 1984) (duty is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another"). Obvious policy reasons support this conclusion: if courts enforce a party's promise to perform an illegal act, or impose tort liability when a party voluntarily assumes a duty to perform an illegal act, they encourage violations of the law.

It is clear, then, that FNBA owed Pew no duty to monitor Fenwick in order to ensure that Fenwick continued the scheme at issue—a scheme whose main ingredient involved deceiving the government. Since FNBA owed Pew no duty to continue the scheme at issue, there can be no liability in tort for FNBA's release of the "assignments" to Fenwick. Therefore, the jury's verdict in favor of Pew on its negligence claim cannot stand as a matter of law.[8]

## II.

The majority insists that the court cannot properly reach the issue of illegality. I disagree. We need not be concerned that FNBA never pled the defense of illegality. Illegality in this case is not a distinct defense but rather is intertwined with the duty issue. FNBA has maintained from the beginning of this litigation that it did not have a duty to refrain from releasing the "assignments" in question. Further, when it moved for summary judgment, and again when it moved for judgment n.o.v.,

---

7. 18 U.S.C. § 1001 provides:
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

8. The district court failed to instruct the jury as to the duty element of Pew's negligence claim. Under Georgia law, however, the question of duty is for the court. *First Fed. Sav. Bank v. Fretthold,* 195 Ga.App. 482, 394 S.E.2d 128, 131 (1990) ("[I]f the court finds no duty was owed, no material question of fact remains for determination by the jury." (citing *Adler's Package Shop v. Parker,* 190 Ga.App. 68, 378 S.E.2d 323 (1989))).

FNBA argued that it owed no duty to Pew. The argument that one owed no duty to assist an illegal act is subsumed under the argument that one owed no duty at all. Thus, having pled that it owed no duty whatsoever, FNBA was not obligated to plead more specifically that it owed no duty because the transactions at issue were illegal.

Moreover, I do not find it problematic that the district court did not mention illegality in its ruling on FNBA's motion for judgment n.o.v. Although we disagree with the rationale given by a district court for its decision, nevertheless, we may properly affirm that decision on other grounds. *Federal Deposit Ins. Corp. v. 232, Inc.*, 920 F.2d 815 (11th Cir.1991).

The majority also argues that the prior panel's reversal of the district court's granting of summary judgment and remand for a trial of the facts necessarily rejected the possibility of nonliability as a matter of law; thus, the "law of the case doctrine" precludes us from upholding the trial court's judgment n.o.v. based upon the rationale that FNBA owed no duty as a matter of law. Again, I disagree. The law of the case doctrine is the principle that "findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *Dorsey v. Continental Casualty Co.*, 730 F.2d 675, 678 (11th Cir.1984). The law of the case doctrine, however, does not preclude the district court on remand or the appellate court itself on a subsequent appeal from considering matters that the appellate court did not resolve in earlier proceedings. *Luckey v. Miller*, 929 F.2d 618, 621 (11th Cir.1991). The prior panel did not address the issue of illegality or the issue of whether a court could find, based upon the facts adduced at a trial, that the defendant owed no duty to the plaintiff as a matter of law; thus, we are not precluded by the law of the case doctrine from addressing these issues as we see fit.

It is significant that the prior panel was addressing a summary judgment while we are faced with a full record following a trial. The application of the law of the case doctrine principle "will, in accord with the rule's purpose of promoting finality, depend considerably on the stage a case has reached when it goes up on appeal...." *Barber v. International Brotherhood of Boilermakers*, 841 F.2d 1067, 1071 (11th Cir.1988). We should be wary of applying the law of the case doctrine in any mandatory fashion. *Foster v. Tandy Corp.*, 828 F.2d 1052, 1058 (4th Cir.1987). "This is particularly true where the previous ruling has been on pre-trial motion, and the subsequent ruling comes after the full development of the case." *Id.* This court has recognized that an appellate court's reversal of a district court's grant of summary judgment and remand for a trial of the facts says nothing about how the evidence should be viewed after a trial. *See, e.g., Shelkofsky v. Broughton*, 388 F.2d 977 (5th Cir.1968) (reversal of summary judgment for a trial by jury would not preclude the district court from later entering summary judgment or judgment n.o.v. if the evidence offered at trial was insufficient to warrant submission to the jury).

The prior panel held that, on the record before it, a question of fact arose as to whether FNBA owed Pew a duty to maintain the "assignments." The prior panel did not say, however, how it would decide the duty issue after reviewing the record developed at trial. The panel's mandate ordered the district court to proceed further to discover the facts; the district court carried out that mandate. We are now presented with additional facts, adduced through a full trial, that bear on the issue of FNBA's duty. A review of the entire record leads me to conclude that much of the activity at issue in this case violated federal law and, thus, could not possibly have given rise to a duty owed by FNBA to Pew. Nothing in the prior panel's mandate precludes this conclusion.

Even if I were to concede arguendo that the prior panel intended by its mandate to preclude the district court and any subsequent panel of this court from holding that FNBA, as a matter of law, owed no duty to Pew, I would still conclude that we could find no duty as a matter of law without

violating the law of the case doctrine. The law of the case doctrine is "self-imposed by the courts ... in the interests of judicial efficiency." *Conway v. Chemical Leaman Tank Lines, Inc.*, 644 F.2d 1059, 1061 (5th Cir.1981). Thus, while "federal courts usually refuse to reopen issues that have been previously decided on appeal, it is within their power to do so." *Westbrook v. Zant*, 743 F.2d 764, 768 (11th Cir.1984). This court has emphasized that "justice is better than consistency," *Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862, 867 (5th Cir.1969) (citation omitted), and has recognized three circumstances where the law of the case doctrine does not apply to preclude reconsideration of an issue previously decided; "[t]hese exceptions occur when (1) the evidence on a subsequent trial was substantially different, (2) controlling authority has since made a contrary decision of the law applicable to the issue, or (3) the previous decision was clearly erroneous and would work a manifest injustice." *Westbrook*, 743 F.2d at 768–69. Even if I were to conclude that the prior panel intended to preclude, regardless of any evidence adduced at a subsequent trial, the finding of no duty as a matter of law, I would find that both the first and third exceptions to the law of the case doctrine are applicable here.

In this case, the evidence on subsequent appeal after a full trial was substantially different from the evidence that the first panel had before it; thus, the law of the case doctrine does not preclude us from concluding that FNBA was under no duty to assist Pew in continuing its illegal behavior even if the prior panel did not so conclude. Moreover, if the prior panel's mandate must, for whatever reason, be interpreted to preclude a finding of no duty as a matter of law despite overwhelming evidence that the transactions from which this alleged duty arose violated federal law and were undertaken with intent to defraud the government, then I would conclude that the prior panel's decision is clearly erroneous and would work a manifest injustice. Pew and Fenwick, in violation of 18 U.S.C. § 371 (1988),[9] concealed the nature of their relationship from the federal government because they feared that the government would disqualify Fenwick from the lucrative minority-owned business program if it discovered the nature of Pew's involvement. In order to circumvent the Assignment of Claims Act, Fenwick and FNBA, at Pew's behest, misrepresented to the government that Fenwick had assigned project proceeds to FNBA. This misrepresentation violated 18 U.S.C. § 1001. Pew asks this court to hold that FNBA had a duty to continue defrauding the government and was negligent in failing to continue defrauding the government. Such a rule of law, it should go without saying, is contrary to the best interests of society.

For the foregoing reasons, I respectfully dissent.

---

9. 18 U.S.C. § 371 provides in pertinent part: If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.